Ronald Vernon **HUFF**, Appellant,

v.

**STATE of Minnesota, Respondent.**

No. A04–1497.

Supreme Court of Minnesota.

June 30, 2005.

---

George C. Hoff, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for Appellant.

Richard B. Bates, St. Paul, MN, for Respondent.

## O P I N I O N

HANSON, Justice.

On March 10, 1999, a St. Louis County jury found appellant Ronald Vernon Huff guilty of first-degree murder while committing domestic abuse under Minn.Stat. § 609.185(6) (1996) for killing Dora Maria Silva. Huff also was found guilty of the lesser-included offense of second-degree unintentional felony murder under Minn. Stat. § 609.19, subd. 2(1) (2004). Because

Huff had a prior qualifying conviction for second-degree murder, he was sentenced to life in prison without the possibility of release in accord with Minn.Stat. § 609.106, subd. 2(3) (2004), which provides that defendants convicted of first-degree murder while committing domestic abuse who have "one or more previous convictions for a heinous crime" shall be sentenced to life without possibility of release. On appeal from the denial of his petition for postconviction relief,[1] Huff argues that he was denied the constitutional right to present a complete defense because (1) the district court erroneously excluded evidence supporting his theory that an alternative perpetrator killed Silva, and (2) the court erroneously excluded evidence of the alternative perpetrator's other bad acts, which would have cast doubt on Huff's guilt. We affirm.

On June 22, 1996, Silva was found dead in the Duluth apartment she shared with Huff. Huff and Silva had met in August 1995 and had been romantically involved for several months. Unexplained circumstances of Silva's death prompted an autopsy. At Huff's trial, the medical examiner testified that the hyoid bone in Silva's throat had been fractured, and that Silva had three broken ribs that had not begun to heal. Although the medical examiner speculated that Silva's ribs were broken during the altercation in which she was strangled, he stated that they could have been broken a week or more earlier. The medical examiner concluded that the cause of Silva's death was "strangulation most likely occurring during a beating," and estimated that Silva died at least 2 weeks before her body was discovered, but not more than a month. Thus, according to the medical examiner, Silva died sometime before June 8.

The two primary suspects in Silva's murder were Huff and Silva's former lover, Faye Wenell. Wenell had been romantically involved with Silva from 1994 to 1995 and had physically assaulted Silva several times during their relationship. Huff also had physically assaulted Silva several times, including as late as June 1, 1996, just days before her death.

On January 23, 1998, roughly 19 months after Silva's death, a St. Louis County grand jury indicted Huff for Silva's murder. At Huff's trial, the state presented evidence that Huff had been arrested on March 17, 1996, and June 1, 1996, for assaulting Silva. The state also presented evidence that Silva had been treated at a hospital emergency room on April 7, 1996, for bruising on her face, neck, chest, abdomen, and a leg. She and Huff were living together at the time, and Silva's treating physician testified that Silva told him the injuries resulted from "her husband" beating her.

The state also introduced evidence that the police search of Huff and Silva's apartment revealed a grocery receipt dated June 4, 1996, as well as most items listed on the receipt. The state called as a witness a cabdriver who testified that he picked up a couple from the grocery store who matched Silva's and Huff's general descriptions and drove them to Silva and Huff's apartment. The cabdriver testified that, during police questioning, he was shown a series of photographs and selected one of Huff as closely resembling the man he picked up, although he was not sure it was the right person.

---

1. This is Huff's first appeal to our court. Although Huff directly appealed his conviction in June 1999, in June 2000 he moved to dismiss his appeal without prejudice in order to pursue a postconviction petition. We granted that motion and dismissed his appeal without prejudice. On February 12, 2004, Huff filed his postconviction petition.

Finally, the state presented testimony from three witnesses who stated that Huff had confessed he was involved in Silva's death. First, a volunteer at a Duluth homeless shelter testified that Huff had said he, while drunk, may have killed Silva. Second, Huff's former jail cellmate testified that Huff had told him that he had choked Silva to death. Last, a Duluth police officer testified that during an unrecorded interview Huff had nodded in agreement when asked whether it was possible that Silva had died during a fight between them that Huff could not remember due to his excessive drinking.

Huff's theory of defense was that the lack of direct evidence linking him to Silva's death—when considered in light of his exculpating testimony and the evidence that Wenell may have killed Silva—precluded the jury from finding that the state had proven guilt beyond a reasonable doubt. Testifying on his own behalf, Huff admitted that he had hit Silva both times he was charged with domestic assault in March and June of 1996, but denied responsibility for injuries Silva sustained on April 6, 1996. Huff testified that after he assaulted Silva on June 1, he was arrested and jailed until June 3. Huff acknowledged that, although he originally had told police that he last saw Silva at their apartment on June 3, he had in fact seen Silva later that day at their landlord's pawnshop. Huff testified that he had not seen her since, and denied accompanying Silva to the grocery store on June 4. He testified that he returned to the apartment around June 6 to get his tribal newspaper from the mailbox outside the apartment building and did not go inside the building. Huff denied confessing that he had or may have killed Silva and stated that he was not responsible for her death.

Huff called several witnesses to support his theory that Wenell killed Silva. Edna Whiteman, a friend of Huff's, testified that she saw Wenell in Duluth on June 6, 1996. Clint Perrin testified that Wenell told him in the summer of 1998 that she had killed Silva with a pipe. Lupe Herrera, a Minneapolis police officer, testified that in May 1998 Wenell said "her lover was murdered" and that "she did it." Lynn Goodwin testified that in November 1995 Wenell had told her that she was going to "beat up Ron [Huff]" so she could have Silva "for herself." James Weir testified that in the summer of 1995 he had observed Silva and another woman, matching Wenell's description, verbally fighting at the bar he owned, and that the other woman had threatened Silva's life.

Huff also called eight law enforcement officers who testified about calls in which Silva was injured and in several instances had identified Wenell as the abuser. Officer Jill Wolf testified that in August 1994 she responded to a call in Minneapolis and found Silva bleeding heavily from a head wound, and that Silva stated Wenell had hit her with a metal rod. Deputy Chris Johnson testified that he responded to a 911 call near Duluth in February 1995 and found Silva with a cut lip and a lump on her head and that Silva told him that Wenell had assaulted her. Officer Scott Herr testified that in July 1995 he responded to a call in Bemidji and found Silva with a lump on her forehead, and that Silva told him she feared for her life. Three weeks later, Officer Herr encountered Silva with several large bruises and dried blood on her shirt, hands, and face. Silva told Herr that she had been punched and kicked, and that Wenell threatened to kill her. Officer Kenneth Hudson testified that he responded to a call in September 1995 at a Duluth hotel and found Silva with several large bumps on her head, a black eye, a swollen lip, and bruising on her arms and legs. Silva told him that she had been hit and kicked by Wenell for up

to 2 days. The physician who treated Silva for these injuries testified that Silva suffered from multiple bruises, sinus fractures, and a perforated eardrum.

Huff also called two of Wenell's former girlfriends, who both testified that Wenell had been abusive and threatening. One testified that Wenell had stalked her, and the other that Wenell had broken into her apartment, attacked her, and choked her.

Finally, Huff called Wenell as a witness. On direct examination, Wenell admitted that she had physically abused Silva several times during their relationship, but on cross-examination she denied any involvement in Silva's death. Wenell testified that she had moved to Arizona in January 1996 and did not return to Minnesota until August 1997, and thus was not in Duluth when Silva was killed. Wenell testified that money was wired to her in Arizona on June 3, 1996, and identified her signature on a Western Union money transfer receipt issued in Arizona.

In his petition for postconviction relief, Huff argued that he was denied his constitutional right to present a complete defense when the district court excluded some alternate perpetrator evidence. Huff made 105 offers of proof, 23 of which he later withdrew and 14 of which became irrelevant when the witness to whom they pertained did not testify. Of the remaining 68 proffers, the court admitted 35. Of the 33 excluded proffers, Huff claims error on 23. These fall into two categories. First, Huff asserts that the court erroneously excluded evidence that connected Wenell to Silva's murder. Second, Huff asserts the court erroneously excluded evidence regarding Wenell's other bad acts, including Wenell's involvement in the death of Michael Grube in 1998.

The district court thoroughly analyzed each offer of proof and stated specific reasons for rejecting each. As is apparent from the discussion above, the court admitted substantial evidence to connect Wenell to Silva's murder, including considerable evidence of Wenell's other bad acts. In general, the court's decision to exclude the remaining items was based on determinations that the evidence was not relevant or lacked probative value. In denying Huff's postconviction petition, the court acknowledged that a criminal defendant is entitled to present a complete defense but concluded "that right does not open the floodgates to evidence that is otherwise inadmissible or so tenuous as to be of doubtful probative value and relevance and overly prejudicial." [2]

## I.

■ We first address Huff's argument that he was denied the opportunity to defend against the state's charge that he killed Silva when the district court excluded evidence that directly connected Wenell to Silva's murder. Evidentiary rulings lie within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). On appeal, the appellant has the burden of establishing that the district court abused its discretion and that appellant was prejudiced thereby. *Id.*

Huff emphasizes that his case was tried before our decision in *State v. Jones*, 678 N.W.2d 1 (Minn.2004), which clarified the standards for the admission of alternative

---

**2.** We compliment both Huff and the district court for their thoroughness in developing the record on these issues. Huff's offers of proof were detailed and identified the specific witnesses who would provide testimony on each point. The district court addressed the evidentiary issues raised by each offer of proof and grounded the rulings in the pertinent rules of evidence.

perpetrator evidence. According to Huff, the district court incorrectly applied a clear and convincing standard when evaluating evidence connecting Wenell to Silva's murder, contravening our statement in *Jones* that "ordinary evidentiary rules" should be applied to such evidence. *Id.* at 17–18. In its order denying Huff's post-conviction petition, the district court noted the publication of *Jones* and stated that the rulings on Huff's offers of proof "comported with applicable rules and law."

■ In *Jones*, we stated that constitutional due process guarantees a defendant's right to a fair opportunity to defend against criminal charges. *Id.* at 15–16 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). A defendant may defend himself against criminal charges by presenting evidence that an alternative perpetrator committed the crime, and the exclusion of such evidence "will almost invariably be declared unconstitutional when it significantly undermines fundamental elements of the defendant's defense." *Id.*, 678 N.W.2d at 16 (citations omitted).

■ In determining the admissibility of alternative perpetrator evidence,[3] district courts must go through a two-step process. First, they must determine whether the evidence offered has an inherent tendency to connect the alternative party with the commission of the crime with which the defendant is charged. *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn.1977); *Jones*,

678 N.W.2d at 16. Then, after a defendant has laid a proper "*Hawkins* foundation" by offering evidence that has an inherent tendency to connect the alternative perpetrator to the commission of the crime, courts may admit "evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts" tending to prove the third party committed the crime. *Hawkins*, 260 N.W.2d at 159. The admissibility of this evidence must be evaluated under the "ordinary evidentiary rules."[4] *Jones*, 678 N.W.2d at 16.

We have identified three excluded offers of proof that may have implicated Wenell in Silva's death. Huff sought to introduce evidence (1) that on the day of Michael Grube's murder in February 1998, Wenell had been assaultive toward the staff and residents at a detox center and repeated Silva's name many times; (2) that Wenell had bragged that she killed someone in Duluth and got away with it; and (3) that Wenell had told Ruth Littlewounded in 1996 and 1998 that she had killed before and could kill again.

In determining the admissibility of this evidence, the district court was required to first determine whether Huff had laid a proper *Hawkins* foundation by offering evidence that had an inherent tendency to connect Wenell to Silva's death. *Jones*, 678 N.W.2d at 16. In a Memorandum accompanying its "Pretrial Order Regard-

---

**3.** It bears emphasizing that we use the phrase "alternative perpetrator evidence" to mean evidence that directly implicates the alternative perpetrator in the crime for which the defendant has been charged. As such, "alternative perpetrator evidence" should be distinguished from so-called "reverse-*Spreigl*" evidence, which describes evidence of *other* "crimes, wrongs, or bad acts committed by the alleged alternative perpetrator in order to cast reasonable doubt upon the identification of the defendant as the person who commit-

ted the charged crime." *Jones*, 678 N.W.2d at 16.

**4.** Prior to *Jones*, some of our decisions may have erroneously implied that courts should apply a clear and convincing standard to alternative perpetrator evidence, when in fact only reverse-*Spreigl* evidence is subject to that heightened standard. *Jones*, 678 N.W.2d at 17.

ing *Hawkins*/Reverse-*Spreigl* Issues," the court concluded that Huff had "made a sufficient showing of 'connectedness' between [Wenell] and the death of Dora Silva." As noted above, the court accordingly admitted substantial evidence tending to show that Wenell had the motive and inclination to murder Silva.

■ The district court excluded evidence of Wenell's assaultive behavior and repetition of Silva's name in February 1998 on the grounds that the evidence was not "probative with regard to any issue tending to show connection between Wenell and the death of Silva" and was "simply not probative, relevant or material as to the circumstances and cause of Silva's death." Huff argues that the court's use of the phrase "show connection" indicates that the court mistakenly required that this proffer demonstrate Wenell was connected to Silva's death. This would be error under *Jones* because, once a defendant has laid a proper *Hawkins* foundation, alternative perpetrator evidence showing motive, threats, or other miscellaneous facts tending to prove the alternative perpetrator committed the act is admissible without further evidence connecting the alternative perpetrator to the crime. *Jones*, 678 N.W.2d at 16; *Hawkins*, 260 N.W.2d at 159. But we conclude that the district court used the words "show connection" not as requiring a heightened *Hawkins'* connection but as a proxy for relevance. *See* Minn. R. Evid. 401. The court provided detailed reasons for rejecting this proffer under ordinary evidentiary rules, consistent with what *Jones* requires. 678 N.W.2d at 17. Because this proffered evidence was vague and inconclusive, and was at best cumulative of more direct evidence, we conclude that the district court did not abuse its discretion in excluding it.

■ The district court also excluded Huff's proffers that Wenell had bragged that she killed someone in Duluth and "got away with it" and that she twice said she had killed before and could kill again. The court excluded evidence that Wenell had bragged about killing someone in Duluth because the proffer was "too general to demonstrate connectedness between Wenell and the death of Silva" and lacked "relevance and materiality." The court excluded Wenell's statements that she had killed before and could kill again because they were "nonspecific and apparently occurred when Wenell was significantly intoxicated."

Without addressing whether the district court applied the proper evidentiary standard, we conclude that excluding each of these proffers was an abuse of discretion because each constitutes a "miscellaneous fact" tending to prove that Wenell may have killed Silva. *Hawkins*, 260 N.W.2d at 159. Minnesota Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Wenell's statement that she killed someone in Duluth and got away with it bears on the question of whether Wenell may have killed Silva. Similarly, Wenell's statements that she had killed before and could kill again constituted miscellaneous facts tending to prove Wenell's involvement in Silva's death.

■ When a court erroneously excludes evidence, the defendant is entitled to a new trial only if he can demonstrate that he was prejudiced. *Amos*, 658 N.W.2d at 203. In *Hawkins*, we held that a defendant was prejudiced by the court's exclusion of evidence when the exclusion deprived the defense of evidence that was crucial to the maintenance of a proper

defense. 260 N.W.2d at 160. In the case at hand, however, we conclude that the excluded evidence was cumulative, not crucial. Witnesses Clint Perrin and Minneapolis Police Officer Lupe Herrera testified that Wenell expressly stated that she had killed Silva. Because the district court admitted evidence of statements by Wenell that she had caused Silva's death, we conclude that Huff was not prejudiced when the court excluded Wenell's more generalized statements that she had killed someone in Duluth and that she had killed before and could kill again.

Accordingly, we hold that the exclusion of this evidence connecting Wenell to Silva's murder did not deny Huff the opportunity to defend himself.

## II.

■■■■ We now turn to Huff's assertion that the district court erroneously excluded evidence of Wenell's other crimes, wrongs, and bad acts. A defendant may present evidence of other crimes, wrongs, or bad acts committed by an alternative perpetrator in order to cast reasonable doubt upon the identification of the defendant as the person who committed the charged crime. *Jones*, 678 N.W.2d at 16. This evidence is known as reverse-*Spreigl* evidence. *Id.* For reverse-*Spreigl* evidence to be admitted, the defendant must first meet the threshold requirement of connecting the alleged alternative perpetrator to the commission of charged crime. *Id.* If the defendant meets this threshold requirement, the proffered reverse-*Spreigl* evidence is admissible if the defendant has shown (1) by clear and convincing evidence that the alleged alternative perpetrator participated in the reverse-*Spreigl* incident, (2) that the reverse-*Spreigl* incident is relevant and material to the defendant's case, and (3) that the probative value of

the evidence outweighs its potential for unfair prejudice. *Id.* at 16–17. We have explained the parameters of reverse-*Spreigl* evidence as follows:

[A defendant should] have the right to show that crimes of a similar nature have been committed by some other person when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the crime charged against him.

*State v. Johnson*, 568 N.W.2d 426, 433 (Minn.1997) (quoting *State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949)).

### A. Michael Grube's Death

Huff claims that the district court erroneously excluded evidence that, 20 months after Silva died, Wenell killed Michael Grube in a manner that resembled the way Silva was killed. In February of 1998, Grube was found dead in a Duluth motel room. Grube was the former boyfriend of Tamara Bluefog. At Huff's trial, Bluefog testified that she had been in a romantic relationship with Wenell from 1991 to 1993. According to Bluefog, when she attempted to end the relationship, Wenell stalked and threatened her, and was particularly angry that Bluefog had entered a relationship with a man. The day Grube died, he had been seen drinking with Wenell. Wenell rented the motel room in which his body was found, and "Maria"— the name by which Wenell referred to Silva—was written backward in soap on the motel room mirror in what appeared to be a woman's handwriting—and a heart was drawn beneath the name. DNA testing revealed that Grube's blood was on footwear Wenell was wearing the day of his death.[5]

---

5. At the time of Huff's trial in February 1999, Wenell had not been charged with Grube's

Two autopsies were performed on Grube's body, and both pathologists testified as part of Huff's offer of proof regarding similarities between Silva's and Grube's deaths. The pathologists agreed that Grube was severely intoxicated at the time he died and that he had sustained multiple soft tissue injuries about the head and face. The first pathologist to examine Grube's body, Dr. Zlonis, testified that Grube's neck showed no signs of manual strangulation and that his hyoid bone was intact when he examined Grube. Zlonis stated that he cut the hyoid bone during his examination. Zlonis concluded that, although it was possible another person had contributed to Grube's death, it was not a "definite" homicide. The second pathologist, Dr. McGee, agreed that there were no signs of manual strangulation on Grube's neck, but concluded that Grube's death was a homicide caused by "asphyxia with multiple soft tissue injuries due to an assault," and noted "acute ethanol intoxication."

Huff argues that the district court's exclusion of evidence that Wenell killed Grube under circumstances sufficiently similar to the death of Silva denied him of a right to present a complete defense. According to Huff, although the deaths of Silva and Grube were not identical as to time or location, they were similar in terms of modus operandi. Huff asserts that the proffered evidence that Wenell was responsible for Grube's murder "compellingly demonstrates that Wenell was an extremely jealous lover who was willing to inflict bodily harm on whomever caused her emotional pain." Huff argues that because the evidence that Wenell had killed Grube would have cast reasonable doubt on Huff's guilt, the court's failure to admit the evidence was prejudicial and entitles him to a new trial.

As noted earlier, the district court concluded that Huff had laid a proper *Hawkins* foundation establishing that Wenell was connected to Silva's death. Having met this threshold requirement, Huff then needed to show (1) by clear and convincing evidence that Wenell killed Grube; (2) that Wenell's killing of Grube was relevant and material to Huff's case; and (3) that the probative value of evidence that Wenell killed Grube outweighed its potential for unfair prejudice. *Jones*, 678 N.W.2d at 16–17.

In determining the admissibility of evidence that Wenell killed Grube, the district court found for purposes of the analysis that Huff had demonstrated by clear and convincing evidence that Grube's death was a homicide, and that it resulted "at least in part from asphyxia resulting from violent acts perpetrated upon him by another human being." However, the court stated that "[t]here is no evidence yet proffered from which the Court can conclude it is 'highly probable' or established by 'clear and convincing evidence' that [Grube] died of manual strangulation." The court then stated that it "presumed" for purposes of the analysis that "it is 'highly probable' it was Faye Wennel [sic] who inflicted the trauma to Mr. Grube" and that "the circumstances are highly suggestive that Wennel [sic] played a part in causing his death." We infer from the court's use of the word "presumed" that, although the court had not found that clear and convincing evidence established that Wenell killed Grube, the court wished to make clear that the proffer did not meet the second and third reverse-*Spreigl* requirements.

murder. Wenell was murdered 3 days after Huff's trial concluded. *See State v. Budreau,*

641 N.W.2d 919, 921 (Minn.2002).

In evaluating whether evidence that Wenell may have killed Grube was relevant and material to Huff's case, the court stated that Wenell's alleged motive for killing Silva—jealous rage aimed at a former lover who had spurned her—could not be meaningfully connected to a motive for killing Grube, as Grube was not Wenell's former lover and he had not recently spurned her. Accordingly, the court concluded that Wenell's possible involvement in Grube's death was not relevant to Huff's case.

The court also rejected Huff's assertion that the circumstances surrounding Grube's death were sufficiently similar to Silva's death to establish a "signature crime," noting that, despite certain similarities, circumstances of each death were dissimilar in several ways:

As to similarities, both occurred in a room with a bed, involved use of force applied manually, resulted at least in part from asphyxia, occurred in a setting where feces were left nearby, involved decedents whose remains were left on their backs covered by cloth items, involved trauma to body regions at and above neck level, involved persons known to Wenel [sic], occurred in locations somewhat near one another geographically, and had as victims persons of brown skinned origin * * *.

[However,] [o]ne was in the victim's home while one was not. One involved a female, the other a male. One was found on the floor, one on a bed. One was clothed; one was not. One was strangled; one was not. One had been drinking; one had not. One had been severely beaten about the face, and as far as can be told, one had not. One had rib fractures; the other did not. One was smeared with feces; one was not. One was covered with bed coverings, the other with a clothing item though bed covering items were close at hand. The door to the room where one was found was locked, the door to the room where the other was found was not. The scene where one was found showed signs of a struggle while the other scene did not. While writing was found on a mirror at one scene, none was present at the other. While one scene was abandoned in a somewhat methodical fashion * * * the scene [where Grube was left] seems to have been more carelessly abandoned * * *.

Given the differences between the deaths, the court concluded that evidence that Wenell killed Grube "simply falls outside the penumbra of circumstances sufficiently similar to those of the death of Silva to be relevant, material and useful" to the jury. Further, the court stated that it could not conclude "the prejudice to a fair and even-handed presentation of the facts for determination by the trier of fact will be balanced, let alone outweighed, by the benefit to be derived by defendant."

We must determine whether the district court abused its discretion in concluding that evidence that Wenell killed Grube was not relevant and material to Huff's case and that the evidence's probative value was substantially outweighed by the danger of unfair prejudice. *Amos*, 658 N.W.2d at 203; Minn. R. Evid. 403. First, we note that the record establishes that the district court approached Huff's proffer regarding the Grube murder with careful deliberation. The court withheld judgment on the issue until the state had rested its case, then heard testimony from two pathologists who examined Grube's body and issued a thorough, detailed memorandum explaining the reasons for excluding the evidence. Having reviewed the record, Huff's offer of proof, and the court's memorandum, we conclude that the court did not abuse its discretion in

excluding Huff's proffer that Wenell killed Grube under circumstances similar to Silva's death.

The following dissimilarities between the deaths of Grube and Silva strike us as particularly significant. First, it does not appear that Huff sought to offer any evidence that Wenell was upset about Bluefog's relationship with Grube in 1998, 5 years after Wenell and Bluefog parted ways. Thus, although the record indicates that Wenell was angry about Silva's relationship with Huff near the time that Silva died, there is no indication that Wenell carried lingering resentment regarding her breakup with Bluefog 5 years earlier. To the contrary, the evidence that Wenell and Grube spent a large part of the day drinking together suggests that Wenell had no general animosity toward Grube. Next, although there was no question that Silva was manually strangled, Grube's hyoid bone was intact during the first autopsy and his neck showed no signs of manual strangulation.

Huff argues that the two deaths were strikingly similar because feces were found in the room adjacent to Silva's body and feces were smeared on Grube's clothing. Huff suggests that the feces in Silva's apartment could have been left as a "signature" by Wenell. It is true that the police search of Silva's apartment showed the carpet in the bedroom next to where Silva's body was discovered had been stained by feces. But police did not test for DNA the feces either in Silva's apartment or on Grube's clothing, so neither could be identified as Wenell's. More importantly, Huff confirmed in his own testimony that the fecal staining of the carpet in Silva's apartment had been caused by

Silva when she had a seizure in May, and that neither he nor Silva had cleaned the carpet. Accordingly, Huff's argument that the feces were a "signature" attributable to Wenell cannot be reconciled with Huff's familiarity with the precise location of the feces in the apartment and his explanation of their origin.

Given the dissimilarities between Grube's death and Silva's death, we hold that the district court did not abuse its discretion in excluding evidence of Wenell's involvement in Grube's death.

### B. Other Bad Acts

Finally, we examine whether the district court abused its discretion in excluding proffers regarding Wenell's other bad acts not related to Grube's death. Huff argues that the district court excluded the proffers on improper grounds.[6] Specifically, Huff alleges that the court's explanations for excluding some of the proffers indicated the court incorrectly applied a clear and convincing standard and/or required that each individual proffer have an inherent tendency to connect Wenell to Silva's murder under *Hawkins*.

We agree that the district court's language in explaining its reasons for excluding Huff's proffers is confusing at points. But we disagree that the court's use of the word of "connection" indicates that the court required each individual proffer to show *Hawkins* connectedness. Rather, the use of "connection" in the court's explanations excluding evidence of Wenell's other bad acts appears responsive to our language in *Johnson*, where we stated that a defendant has the "right to show that crimes of a similar nature have been committed by some other person when the acts

---

6. The excluded proffers included, *inter alia*, evidence that Wenell had engaged in threatening behavior toward a number of people, that Wenell had assaulted various persons, that Wenell had engaged in disorderly conduct several times, and that Wenell had used bodily waste in inappropriate ways.

of such other person *are so closely connected in point of time and method of operation* as to cast doubt upon the identification of defendant as the person who committed the crime charged against him." 568 N.W.2d at 433.

For example, in excluding Huff's proffer that Wenell had spread feces in a bar restroom, the district court stated, "The Court finds no similarity between [Wenell spreading feces in a bar restroom] and the death of Silva to render defendant's proffer relevant, useful or convincing as demonstrating Wenell's connection with the death of Silva." Here, the judge appears to have used the term "connection" as we used it in *Johnson* to emphasize that Wenell's bad act of spreading feces in a bar restroom is not sufficiently connected in "method of operation" to Silva's death to make the evidence relevant.

Moreover, to whatever extent the district court may have blended *Hawkins* foundation requirements with the clear and convincing evidentiary requirements for admission of reverse-*Spreigl* evidence, we conclude the court cited independently adequate grounds for excluding the proffers in question under the second and third reverse-*Spreigl* requirements. The court repeatedly emphasized that the proffers were not relevant or material, that they lacked probative value, and that they sought to introduce inadmissible character evidence. *See Jones,* 678 N.W.2d at 16–17.

 Further, it bears emphasizing that the district court admitted a great deal of specific reverse-*Spreigl* evidence regarding Wenell's other bad acts. In *State v. Washington,* we recently noted that trial courts may properly limit the number of *Spreigl* incidents admitted in order to reduce the risk that juries may become fixated on prior incidents in a way that blurs the line between "proving modus operandi and impugning a defendant's character." 693

N.W.2d 195, 203 (Minn.2005). By extension, in reverse-*Spreigl* contexts, courts may properly limit the number of incidents admitted in evidence where necessary to assure the line between demonstrating the alternative perpetrator's modus operandi and impugning his or her character does not become blurred. *See* Minn. R. Evid. 403 (explaining that "needless presentation of cumulative evidence" may be controlled).

 Here, the district court admitted testimony from two of Wenell's former girlfriends who stated that she had abused and threatened them to the point that they feared serious harm. The court also allowed testimony from at least eight law enforcement officials, an emergency room physician, and various other disinterested bystanders who testified to Wenell's threatening and abusive behavior toward Silva. Because the court allowed Huff to introduce substantial evidence establishing that Wenell was a belligerent, threatening lover who put her girlfriends in fear of their well-being, we conclude that admission of more generalized bad act evidence would have been cumulative and would have created a serious risk of fixating the jury on Wenell's character rather than her modus operandi. Accordingly, we hold that the district court did not abuse its discretion when it excluded some of Huff's proffers regarding Wenell's other bad acts.

Affirmed.