STATE OF MINNESOTA

IN SUPREME COURT

A23-0154

| | |
|---|---|
| Ramsey County | Procaccini, J. |
| State of Minnesota, | |
| Respondent, | |
| vs. | |
| Andrew Vernard Glover, | Filed: March 20, 2024 |
| | Office of Appellate Courts |
| Appellant. | |

---

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

---

S Y L L A B U S

1.    The district court did not err in concluding that the police had probable cause to arrest appellant.

2.    The district court did not clearly err in finding that the police did not materially misrepresent information in the application for a warrant to search appellant's residence.

1

3.      The district court did not abuse its discretion by denying appellant's motion to admit reverse-*Spreigl* evidence.

4.      The district court did not violate appellant's confrontation rights by denying defense counsel's request to cross-examine the lead investigator about whether police had investigated unnamed suspects from a prior shooting of one of the victims.

Affirmed.

O P I N I O N

PROCACCINI, Justice.

Appellant Andrew Vernard Glover appeals from a final judgment of conviction of first-degree murder while committing a drive-by shooting.[1]   Glover contends that the district court erred in concluding that police had probable cause to arrest him.  He also claims that the police recklessly misrepresented material information in the application for a warrant to search his residence and that the district court clearly erred in finding otherwise.  Glover further argues that the district court abused its discretion by denying his request to admit reverse-*Spreigl* evidence against an alleged alternative perpetrator. Finally, Glover argues that the district court abused its discretion and violated his confrontation rights by denying his request to cross-examine the lead investigator about

---

[1]      This appeal is before our court pursuant to Minnesota Rule of Criminal Procedure 29.02, subd. 1(a), which provides that "[a] defendant may appeal as of right from the district court to the Supreme Court from a final judgment of conviction of first-degree murder."  In accordance with Minnesota Rule of Criminal Procedure 29.02, subd. 1(d), which provides that "[o]ther charges that were joined for prosecution with the first-degree murder charge may be included in the appeal," this appeal also includes Glover's convictions for drive-by shooting and ineligible person in possession of a firearm.

2

the investigation's scope.  Because we conclude that the district court did not err or abuse its discretion, we affirm.

## FACTS

On February 23, 2021, Saint Paul police officers and emergency personnel responded to reports of a shooting outside of a Saint Paul bar.  Once there, officers discovered Raymond Renteria-Hobbs, shot and dying, in the bar's vestibule.  Shortly after arriving at Regions Hospital, Renteria-Hobbs succumbed to his injuries.  The medical examiner deemed the death a homicide caused by multiple gunshot wounds.  Renteria-Hobbs had been shot 10 times.  He was 20 years old.

At the bar, police also found M.P., a second victim, shot in the back.  First responders transported her to a nearby hospital, and she survived.

After securing the crime scene, police canvassed the area for evidence.  Across the street from the bar, officers recovered 9-millimeter cartridge casings.  Officers also documented bullet damage to parked vehicles, blood, and a loaded firearm on the sidewalk in front of the bar.  The firearm's magazine did not contain cartridges matching those recovered in the street.[2]

Officers also began reviewing the bar's security camera footage.  Summarized below, the footage depicts the events leading up to the shooting, the shooting itself, and its aftermath.

---

[2] Police later determined that the firearm belonged to Renteria-Hobbs and fell from his clothing as he fled the shooting.

Approximately half an hour before the first 911 calls, Renteria-Hobbs arrived at the bar. A few minutes later, Glover arrived in a Dodge Journey and parked across the street. Bobby Cole was in the vehicle with him. Glover exited the driver's side of the car, Cole exited the passenger's side, and the two entered the bar.

Inside, Cole and Glover encountered Renteria-Hobbs. Cole and Renteria-Hobbs greeted one another, but Renteria-Hobbs turned away without greeting Glover. The footage shows Glover wearing a Snoopy sweatshirt and a distinctive hat.

Renteria-Hobbs went to the bar's patio alone. Shortly afterward, Glover went to the patio and approached him. The men spoke. Renteria-Hobbs moved his arms in an animated fashion and turned his back to Glover. Renteria-Hobbs then re-initiated the interaction before shaking his head and returning inside. Glover followed shortly afterward.

In the bar, Glover watched Renteria-Hobbs and tried to get his attention. Glover again approached Renteria-Hobbs. The two returned to the patio, where they briefly spoke before going back inside.

Eventually, Glover made a phone call and left the bar. Around the same time, a car pulled up outside and idled. Glover approached the car, reached inside, and appeared to briefly converse with an occupant before walking away. The car drove off as Glover crossed the street to his own car, entering the driver's side. His car's headlights flickered and then shut off.

Meanwhile, inside the bar, Cole attempted to get Renteria-Hobbs to go outside. At 8:02 p.m., the men exited the bar and crossed the street towards Glover's car. Cole walked around to the passenger side, and Renteria-Hobbs stood in the street near the driver's side.

Almost immediately after Cole and Renteria-Hobbs approached the car, people outside and inside the bar reacted to apparent gunshots.[3] The car's lights turned on, and it sped away. Renteria-Hobbs stumbled towards the bar, a firearm fell from his clothing onto the sidewalk, and he entered the bar's vestibule, where he collapsed. M.P. was also outside when the shooting occurred, and she was shot in the back. 911 calls began at 8:03 p.m., and first responders arrived at 8:07 p.m.[4]

To identify the shooter, officers searched for recent incidents involving a Dodge Journey. This search led them to a recent traffic stop involving Glover, whose appearance matched that of the suspected shooter from the security footage. Pursuant to a pickup-and-hold,[5] officers arrested Glover 2 days after the shooting. At the time of his arrest, Glover was wearing the same Snoopy sweatshirt shown in the bar's security footage.

---

[3] Cameras at a bar down the street captured grainy, in-frame footage of the shooting, showing flashes of light emit repeatedly from the area near the driver's side of Glover's car. The State posits that these are muzzle flashes.

[4] Cellphone records later revealed that Glover and Cole travelled away from the crime scene together.

[5] At a hearing on Glover's motion to suppress, the lead investigator testified about the procedure and contents of a pickup-and-hold, also known as a "PC to detain." A pickup-and-hold is submitted to an electronic system. The hold is communicated to the county's emergency call center and patrol officers in the area. The hold contains information on the wanted individual, persons critical to the investigation, wanted vehicles, the incident underlying the hold, and weapons involved. In this case, the lead investigator

Investigators interrogated Glover. He admitted that he was at the bar on the night of the shooting but claimed to have arrived alone at around 9:30 or 10:00 p.m. He initially denied knowing Renteria-Hobbs but later conceded that Renteria-Hobbs was his cousin's friend, that they went to the bar's patio for a "smoke," and that Renteria-Hobbs wanted to buy cocaine from him. Glover repeatedly denied any association with Cole. Though Glover initially stated that no altercations occurred in the bar, by the interrogation's end he suggested that Renteria-Hobbs had a dispute with another bar patron.

Police officers also impounded Glover's car and examined it for gunshot residue, fingerprints, and DNA samples. Testing identified gunshot residue in the vehicle, indicating that "somebody in or near the vehicle discharged a firearm or somebody had gunshot residue on them and then got into the vehicle." Forensics specialists matched Glover's fingerprints to latent prints lifted from the car but did not match any to Cole.

Police obtained and executed a warrant to search Glover's residence. The warrant authorized police to search for clothes Glover wore during the shooting and the murder weapon. At the residence, officers discovered the hat Glover wore the night of the shooting, a loaded Bersa .380 handgun, and rounds of 9-millimeter and .22-caliber ammunition. DNA testing on the grip of the firearm revealed a mixture of three or more individuals, with Glover's DNA profile as a major contributor. Notably, a Bersa .380 cannot fire 9-millimeter rounds, like those used in the shooting. For this reason, the

drafted the pickup-and-hold, and other officers, including his partner and supervisor, reviewed it by discussing the evidence and development of probable cause.

9-millimeter ammunition was relevant in indicating that Glover possessed the type of firearm used in the murder—a weapon that was never found.

Glover moved to suppress the evidence obtained during his arrest, including the Snoopy sweatshirt, arguing that the officers lacked probable cause to believe he had committed a crime. He also moved to suppress the evidence obtained during the search of his residence, including the hat and 9-millimeter ammunition, arguing that law enforcement recklessly misrepresented material information in the search warrant application.

After an evidentiary hearing, the district court concluded that police had probable cause to arrest Glover based on reasonable inferences drawn from the bar's security footage. The district court also found that the lead investigator did not recklessly misrepresent Glover's interaction with Renteria-Hobbs when he used the word "confrontation" in the search warrant application for Glover's residence because that word reflected reasonable inferences drawn from the bar's security footage.

The district court further concluded that the totality of the circumstances, as contained in the warrant application, supported an inference that Glover was the shooter. These circumstances included the interactions between Glover and Renteria-Hobbs, Glover exiting the bar just before Renteria-Hobbs, the location of the spent casings, and the proximity of Renteria-Hobbs to Glover's vehicle when the shooting occurred.

Shortly before the district court denied the motion to suppress, Glover gave notice of an alternative perpetrator defense, alleging that Cole was the shooter. Glover also moved to introduce evidence of Cole's prior crimes: a 2017 incident resulting in Cole's conviction for threats of violence in which Cole kicked in his girlfriend's front door, hit

7

her with his cane, and threatened to have his mom bring a gun over and shoot her; and a 2019 incident resulting in Cole's conviction for first-degree aggravated robbery in which Cole and an accomplice robbed a victim at gunpoint on the light rail in Saint Paul.

The district court allowed Glover's alternative perpetrator defense but denied his motion to admit the evidence of Cole's prior crimes, concluding that those crimes were neither relevant, nor material, to the charged offense. The court concluded that the only similarity between the prior and charged crimes was the use or threatened use of a firearm. The court also found that the risk of the prior crimes serving as impermissible propensity evidence outweighed their probative value.

The case proceeded to trial. The district court denied defense counsel's request to cross-examine the lead investigator about whether he had investigated unnamed suspects from a prior shooting of Renteria-Hobbs. The court concluded that the evidence was inadmissible as irrelevant and that its risk of unfair prejudice substantially outweighed its probative value. The court also suggested that the proposed cross-examination was an improper means of introducing an additional alternative perpetrator theory. The court determined that Glover did not have sufficient evidence to pursue this theory because there were no known suspects from the prior shooting or any evidence linking them to the murder. The court also raised concerns that such evidence improperly impugned Renteria-Hobbs's character.

The jury acquitted Glover of first-degree premeditated murder but found him guilty on all remaining counts. The district court imposed a mandatory sentence of life with the possibility of release after 30 years for the first-degree murder while committing a drive-by

shooting conviction, a consecutive 48-month sentence for the drive-by shooting conviction, and a 60-month sentence for the ineligible person in possession of a firearm conviction, to run concurrent with the murder conviction.  Glover now appeals.

**ANALYSIS**

**I.**

We first address Glover's claim that the district court erred in concluding that there was probable cause for his arrest.  Glover claims that the bar's security footage leaves "too many unanswered questions and innocent possibilities for a person of ordinary care and prudence to entertain an honest and strong suspicion that" he committed a crime that night.  Glover argues that the evidence seized following his arrest should have been suppressed because there was no probable cause to arrest him.  We disagree.

We review a pretrial order on a motion to suppress de novo.  *State v. Onyelobi*, 879 N.W.2d 334, 342–43 (Minn. 2016).  Our inquiry is "whether the police articulated an adequate basis for the" challenged arrest.  *Id.* at 343 (citation omitted) (internal quotation marks omitted).  Although we assess the district court's factual findings for clear error, we review legal determinations, including probable cause, de novo.  *Id.* at 343 n.4.

The United States and Minnesota Constitutions protect a person's right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV; Minn. Const. art. I, § 10.  "A warrantless arrest is reasonable if supported by probable cause."  *State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011).  Probable cause to arrest exists "when a person of ordinary care and prudence, viewing the totality of circumstances objectively, would entertain an honest and strong suspicion that a *specific* individual has committed a

9

crime." *Id.* (citation omitted) (internal quotation marks omitted). "Probable cause requires something more than mere suspicion but less than the evidence necessary for conviction." *Id.* Probable cause is an objective inquiry and depends upon all facts of an individual case. *Id.*

We have previously determined that probable cause existed when similar evidence linked the defendant to the crime, though there was no footage of, or eyewitness to, the crime itself. In *State v. Jenkins*, we concluded that police had probable cause to arrest a defendant based on witness accounts that, shortly before the murder, the defendant possessed a gun and interacted with the victim at the eventual crime scene, the defendant was seen at the location where the murders were committed, and then—shortly after the murder—someone matching the defendant's description left the crime scene. 782 N.W.2d 211, 221–22 (Minn. 2010). In addition, someone used a victim's cellphone to call a cab to an area near the defendant's residence, and when police confronted the defendant, he lied about his identity. *Id.* at 222. Similarly, in *Williams*, we concluded that a police officer had probable cause to arrest the defendant when, during a lawful investigatory stop on an armed robbery report, the officer saw the defendant in a public place with the butt of a pistol sticking out of his pocket, heard the defendant admit to possessing a pistol, and corroborated that admission by removing the pistol from the defendant's pocket. 794 N.W.2d at 873.

The police had probable cause to arrest Glover. The circumstances, viewed objectively, support an honest and strong suspicion that Glover shot Renteria-Hobbs and M.P. The objective evidence supporting probable cause to arrest Glover, available to

10

police at the time of his arrest, included security footage depicting the following: Glover and Renteria-Hobbs having an animated exchange on the bar's patio; Glover monitoring Renteria-Hobbs inside the bar; Glover going outside to an idling vehicle and reaching inside; Glover climbing into his car across the street from the bar and turning off the headlights; Cole walking outside with Renteria-Hobbs towards Glover's car and rounding the passenger side; Renteria-Hobbs collapsing in the street near Glover's driver's side window after being shot 10 times; and Glover's car speeding away immediately after the shooting.

We conclude that a person of ordinary care and prudence, viewing the circumstances objectively, would have an honest and strong suspicion that Glover shot Renteria-Hobbs. Accordingly, Glover's arrest was supported by probable cause and lawful under the United States and Minnesota Constitutions, and the district court did not err in denying Glover's motion to suppress evidence obtained pursuant to his arrest.

II.

We next address Glover's claim that the district court clearly erred in denying a motion to suppress evidence obtained in the search of his residence. Glover asserts that the police recklessly misrepresented his interaction with Renteria-Hobbs as a "confrontation" in the search warrant application, and that this purported misrepresentation was material to the probable cause determination.

"A search warrant is void, and the fruits of the search must be excluded, if the application includes intentional or reckless misrepresentations of fact material to the findings of probable cause." *State v. Moore*, 438 N.W.2d 101, 105 (Minn. 1989). To

11

invalidate a warrant on these grounds, the defendant must show that: "(1) the affiant deliberately made a statement that was false or in reckless disregard of the truth, and (2) the statement was material to the probable cause determination." *State v. Andersen*, 784 N.W.2d 320, 327 (Minn. 2010) (citation omitted) (internal quotation marks omitted). A misrepresentation is material if, when set aside, there is no longer probable cause to issue the search warrant. *Id.* We review the district court's finding of whether an affiant made statements that were false or in reckless disregard of the truth for clear error. *Id.* But we review de novo the district court's determination of whether an alleged misrepresentation was material. *Id.*

Factual findings are not clearly erroneous "if there is reasonable evidence to support them." *State v. Finnegan*, 784 N.W.2d 243, 251 (Minn. 2010) (citation omitted) (internal quotation marks omitted). Here, the district court found that there were no "false statements or statements made in reckless disregard for the truth" in the search warrant application and denied Glover's motion to suppress. The district court found that the affiant's characterization of the interaction between Glover and Renteria-Hobbs as a "confrontation" was based on reasonable inferences drawn from security footage.

The district court did not clearly err. A "confrontation" need not be physical. *See Confront, The American Heritage Dictionary* (5th ed. 2011) ("To come face to face with, especially with defiance or hostility."). Based on the surveillance footage showing the repeated, and seemingly hostile, face-to-face interactions between Glover and Renteria-Hobbs shortly before the shooting, it was reasonable to conclude that they had a "confrontation." Additionally, the drafting police officer appropriately qualified the

12

challenged statement, alleging that it "appear[ed]" that Glover and Renteria-Hobbs had a confrontation. *See Andersen*, 784 N.W.2d at 329 (concluding that the search warrant application's reference to "possible evidence of foot traffic" was appropriately qualified by the word "possible"). Although the officers could have used a different word to describe those interactions, given the evidence available and the reasonable inferences drawn from it, we cannot conclude that the district court clearly erred in finding there was no reckless misrepresentation.

Because we conclude that the district court did not clearly err in finding that there was no reckless misrepresentation, we need not determine whether the use of the word "confrontation" was material to the probable cause analysis.

III.

Glover next asserts that the district court should have allowed him to admit evidence of Cole's prior crimes. We affirm a decision to exclude such evidence unless the district court abused its discretion. *Huff v. State*, 698 N.W.2d 430, 435–46 (Minn. 2005) (applying an abuse of discretion standard to a district court's ruling on the admissibility of prior crimes evidence). "A court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Riley v. State*, 792 N.W.2d 831, 833 (Minn. 2011).

Due process grants all criminal defendants "a meaningful opportunity to present a complete defense." *State v. Swaney*, 787 N.W.2d 541, 556 (Minn. 2010) (citation omitted) (internal quotation marks omitted). This includes the right to present evidence. *Id.* Courts may permit a defendant to introduce alternative perpetrator evidence, which inculpates a

13

third person in the crime's commission to cast reasonable doubt on the State's case. *Id.* at 557. To admit such evidence, there must be "an inherent tendency to connect the alternative party with the commission of the crime." *Id.* (citation omitted) (internal quotation marks omitted). The parties agree that Glover established an inherent tendency to connect Cole to the commission of the charged crimes and that the district court properly allowed Glover to assert that Cole was a potential alternative perpetrator. Their dispute focuses on the district court's decision to exclude evidence related to Cole's prior bad acts.

A defendant may "present evidence of an alternative perpetrator's other crimes, wrongs, or bad acts" under certain circumstances. *Id.* Evidence of these other bad acts is known as reverse-*Spreigl* evidence and is "admissible to cast reasonable doubt upon the identification of the defendant as the person who committed the charged crime." *Id.* (citation omitted) (internal quotation marks omitted). To admit reverse-*Spreigl* evidence, the defendant must show three things: (1) clear and convincing evidence of the alternative perpetrator's participation in the reverse-*Spreigl* incident; (2) "that the reverse-*Spreigl* incident is relevant and material" to the charged crime; and (3) "that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice." *Id.*

The parties agree that the first requirement is satisfied because both prior crimes resulted in criminal convictions, but they dispute the application of the second and third requirements. We first address whether Cole's prior crimes—the 2017 threats of violence incident and 2019 aggravated robbery incident—are relevant and material to Glover's case.

When reverse-*Spreigl* evidence is offered to cast doubt upon the identity of the person who committed the charged offense, such evidence is relevant and material if it is

14

"sufficiently similar to the charged crime in terms of time, place, or modus operandi." *Id.*; *see State v. Gutierrez*, 667 N.W.2d 426, 437 (Minn. 2003) (stating that a defendant may, under certain circumstances, present evidence of the alternative perpetrator's prior crimes that are "so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed" the charged crime (citation omitted) (internal quotation marks omitted)). Although we "will readily uphold the admission of so-called 'signature' crimes to prove" a perpetrator's identity, *State v. Johnson*, 568 N.W.2d 426, 434 (Minn. 1997), the crime need not be "signature" so long as it is sufficiently similar to the charged offense. *Swaney*, 787 N.W.2d at 558. Absolute similarity is not required, but the greater the similarity between the prior crime and the charged crime, the greater the likelihood that the incident is relevant. *Johnson*, 568 N.W.2d at 434.

Our decision in *State v. Swaney* illustrates the high degree of similarity required between the reverse-*Spreigl* incident and the charged crime to establish relevance, as well as the deference we afford a district court's determination under the abuse of discretion standard. 787 N.W.2d at 557–59. In *Swaney*, we concluded that reverse-*Spreigl* evidence of the alternative perpetrator's prior crimes of kidnapping and robbery was irrelevant to the charged crimes of kidnapping and murder, as the incidents occurred 19 days and dozens of miles apart, involved different weapons, and were spurred by different motives. *Id.* at 559. We also noted that the district court reasonably determined that the modi operandi of the two incidents were not sufficiently similar. *Id.* The prior crimes helped facilitate an escape from jail, while the charged crimes sought to facilitate a robbery. *Id.* In addition, the prior

crimes involved the threatened use of a knife to ensure a victim's cooperation, while the charged crimes involved the actual use of a rock to kill a victim. *Id.* "Though the crimes were not entirely dissimilar in terms of time and geographic location," we concluded that they were not sufficiently similar for us to hold that the district court abused its discretion by excluding the evidence. *Id.*

Turning to the facts in this case, there are few similarities between Cole's prior crimes and the crimes here. As Glover points out, both the prior and charged crimes occurred in the Twin Cities metro area and involved violence with a gun. But there are significant dissimilarities that ultimately make the evidence of Cole's crimes less relevant to the charged crimes than was the case in *Swaney*. Although Cole's prior crimes involved the use or threatened use of a gun, neither involved a shooting or death. And Cole's crimes occurred years, rather than days or weeks, before the shooting at issue here. Given these differences, the district court did not abuse its discretion by determining that Cole's convictions for threats of violence and aggravated robbery were not relevant to the crimes committed in this case and by excluding that evidence.[6]

IV.

Finally, we address Glover's claim that the district court violated his Confrontation Clause rights by limiting defense counsel's cross-examination of the lead investigator

---

[6]     Because we conclude that the district court did not abuse its discretion in finding that the reverse-*Spreigl* incidents were not relevant and material to the charged offense, we need not address the third requirement for admitting reverse-*Spreigl* evidence: whether the probative value of the evidence outweighs its potential for unfair prejudice. *See Swaney*, 787 N.W.2d at 557–59 (concluding only that the district court did not abuse its discretion in determining that the prior and charged crimes were not sufficiently similar).

16

about whether the police had investigated unnamed suspects from a prior shooting of Renteria-Hobbs. "Rulings on evidentiary matters rest within the sound discretion of the district court." *State v. Tran*, 712 N.W.2d 540, 550 (Minn. 2006). Therefore, we will not reverse the district court's evidentiary rulings absent a clear abuse of discretion. *Id.* But we review de novo whether the exclusion of evidence violates a defendant's rights under the Confrontation Clause. *State v. Gilleylen*, 993 N.W.2d 266, 278 (Minn. 2023).

The United States and Minnesota Constitutions provide the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; Minn. Const. art. I, § 6. The same analysis applies to both confrontation clauses. *Gilleylen*, 993 N.W.2d at 278. The district court's ability to curtail cross-examination is limited by the right of confrontation. *Tran*, 712 N.W.2d at 550–51. But this right "guarantees only an opportunity for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 551 (citations omitted) (internal quotation marks omitted). "The right to confront witnesses is not violated by limitations on cross-examination so long as the jury is presented with sufficient information from which to appropriately draw inferences as to the witness's reliability." *Gilleylen*, 993 N.W.2d at 278 (citations omitted) (internal quotation marks omitted). "Based on concerns about such things as harassment, decision making on an improper basis, confusion of the issues, and cross-examination that is repetitive or only marginally relevant, the [district] court possesses wide latitude to impose reasonable limits on cross-examination of a prosecution witness." *Tran*, 712 N.W.2d at 550 (alteration in original) (citation omitted) (internal quotation marks omitted). Put differently, "evidence

proffered in support of the defense must still comply with the rules of evidence." *State v. Nissalke*, 801 N.W.2d 82, 102 (Minn. 2011).

Glover's claim relies heavily on *State v. Tran*, where we addressed whether the district court abused its discretion by limiting defense counsel's cross-examination of investigators. 712 N.W.2d at 550. Tran, on trial for murder, questioned investigators about suspects he "claimed should have been investigated more thoroughly," but was not allowed to ask about a suspect's alleged gang affiliation under Minnesota Rule of Evidence 403, as the district court found the questioning substantially more prejudicial than probative. *Id.* We concluded that the district court did not abuse its discretion, emphasizing the deference afforded such evidentiary determinations and stating that the proposed questioning did not directly implicate the Confrontation Clause, as Tran's goal in introducing the evidence was not to show the investigator's bias. *Id.* at 551. Tran was able to introduce sufficient evidence to support his "argument that the police had not properly investigated," but we determined that the district court was correct in otherwise limiting his questioning. *Id.* We also raised concerns that Tran's proposed questioning sought to circumvent limitations on alternative perpetrator evidence. *Id.*

Glover relies on *Tran* because in that case we acknowledged that the district court permitted Tran to question investigators about their lack of interest in other suspects. Glover argues that the questioning he sought would have similarly shown that the police failed to conduct a thorough investigation and were biased against him. But in making this argument, Glover overlooks important differences between his trial and the circumstances in *Tran*. In *Tran*, the defendant identified the suspect who police allegedly failed to

18

investigate, had evidence that the suspect and victim's relationship soured shortly before the murder, and knew that the suspect refused to give a DNA sample to police to aid the investigation. *Id.* at 545. In contrast, Glover did not identify any suspects in the prior shooting or point to evidence linking that shooting to the murder here.

When limiting Glover's cross-examination, the district court characterized the issue as balancing "a defense theory of failure to investigate leads" against a lack of relevance, a risk of unfair prejudice, and the attempted introduction of improper alternative perpetrator or character evidence. Ultimately, the district court's ruling "boil[ed] down to" a lack of relevance under Minnesota Rule of Evidence 401. The district court was also concerned that the cross-examination raised issues of unfair prejudice under Minnesota Rule of Evidence 403, and improperly impugned Renteria-Hobbs's character under Minnesota Rule of Evidence 404(a)(2).

The district court did not abuse its discretion when it denied Glover's request to question the lead investigator about the investigation's scope. That decision rested, ultimately, on relevancy grounds. There was substantial evidence that Glover murdered Renteria-Hobbs. In contrast, there was no evidence, let alone a named suspect, linking the prior shooting to the murder in this case. We have observed that "not everything tends to show bias, and courts may exclude evidence that is only marginally useful for this purpose." *State v. Lanz-Terry*, 535 N.W.2d 635, 640 (Minn. 1995). District courts are right to examine such evidence carefully. It "must not be so attenuated as to be unconvincing because then the evidence is prejudicial and fails to support the argument of the party invoking the bias impeachment method." *Id.*

19

Under Minnesota Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any" fact of consequence more "or less probable than it would be without the evidence." Here, there was no identified suspect from the prior shooting, nor did investigators have reason to believe that the prior shooting was connected to the murder of Renteria-Hobbs. Given the deference afforded the district court's evidentiary determinations, we cannot say that the district court abused its discretion by limiting the proposed cross-examination on relevancy grounds.[7]

Finally, the district court did not violate Glover's confrontation rights, because Glover's cross-examination of the lead investigator was extensive and included questions about the investigation generally and the possibility that Glover was not the shooter. *See Lanz-Terry*, 535 N.W.2d at 642 (concluding that limitations on cross-examination did not violate right of confrontation or right to present a defense because the jury had sufficient information to make discriminating appraisal of a witness's testimony, including cross-examination revealing inconsistencies, poor observation skills, and potential bias).

## CONCLUSION

For the foregoing reasons, we affirm the judgment of convictions.

Affirmed.

---

[7] The district court was rightfully concerned that Glover's attempt to introduce evidence of the officers' failure to investigate unknown suspects may have been an impermissible means of circumventing limitations on alternative perpetrator evidence. *See Tran*, 712 N.W.2d at 551. Although defense counsel claimed that this was not the goal of the proposed questioning, counsel also acknowledged a lack of "sufficient evidence for the alternative perpetrator theory" as to the unknown suspects. As noted above, an alternative perpetrator theory requires evidence with an inherent tendency to connect the alternative perpetrator to the charged crime. *Swaney*, 787 N.W.2d at 557. Limitations on alternative perpetrator evidence should not be circumvented by such questioning.