**STATE of Minnesota, Respondent,**

**v.**

**Randy Leeroyal SWANEY, Appellant.**

**No. A08–2002.**

Supreme Court of Minnesota.

Aug. 26, 2010.

**544**

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, MN; and Donald R. Klosterbuer, Rock County Attorney, Luverne, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Randy Leeroyal Swaney was convicted in Rock County, Minnesota of first-degree premeditated murder for the death of Carrie Nelson and was sentenced to life in prison without any possibility of release. Swaney filed a direct appeal of his convictions. On appeal, Swaney argues that (1) the admission of an investigator's out-of-court questions violated his Confrontation Clause rights, (2) the district court violated his right to present a defense by excluding reverse-*Spreigl* evidence regarding an alternative perpetrator, (3) the State committed prosecutorial error, and (4) the district court erred when it permitted the State to introduce rebuttal evidence. Swaney also makes several other arguments in his pro se supplemental brief. We affirm.

Carrie Nelson was killed on the afternoon of May 20, 2001, while working at Blue Mounds State Park in Rock County in southwestern Minnesota. Nelson was a part-time seasonal employee at the Park and worked in a building, known as the contact station, located at the park entrance. Nelson's job duties included greeting park visitors and selling vehicle and camping permits.

On May 20, Nelson was scheduled to work at the contact station from approximately 8:00 a.m. until 3:30 p.m. Blue Mounds State Park contained a camp-

ground, climbing sites, an interpretive center, and a park residence in addition to the contact station. R.W., whose father was the Park's manager, worked as the interpretive-center host and was the only other employee on duty that day. Nelson and R.W. spent most of the morning of May 20 together in the contact station. At approximately 12:45 p.m., R.W. took the park motor vehicle to the interpretive center, which was located at the other side of the park from the contact station. Sometime after 2:00 p.m., R.W. returned and parked the vehicle at the contact station. Without entering the station, R.W. walked over to the park residence, which is about 100 yards to the west of the station. She went into the residence, where she lived with her mother and her father, to change her clothes, which had gotten wet because it had been raining.

R.W. left the park residence at about 2:30 p.m. and walked the short distance to the contact station. As she opened the back door, R.W. saw Nelson lying on the floor behind a counter with blood on her ear. At about the same time, the front-door chime sounded and a park visitor entered the contact station. The chime startled R.W., and she closed the back door and ran back to the park residence. The visitor entered the contact station and waited in the public space to be helped. While waiting, the visitor noticed that in the area behind the counter that separates the public space from the employee-only area there was a fax machine receiver hanging down from its cord. She then looked over the counter and saw Nelson's body. After seeing Nelson's body, the visitor left the contact station and called 911 from a cell phone. Back at the park residence, R.W. told her parents what she had seen. Her mother then called 911 and her father went to the contact station. R.W.'s father entered the contact station from the back door, walked over to Nelson's body, and determined that Nelson was dead.

A 911 dispatcher notified law enforcement officers of the incident at 2:45 or 2:46 p.m., and several officers were at the Park within four to eight minutes. The officers secured the contact station, identified all individuals in the Park—roughly ten people at that time—and took statements from each individual. A husband and wife who were camping at the Park stated that they saw Nelson outside the contact station as they walked by the building at around 1:15 or 1:30 p.m. The husband stated that while he was at his campsite at about 2:15 or 2:30 p.m., he heard the sound of "spinning of gravel" and saw one person in a white automobile, which he thought to be a two-door Oldsmobile or Monte Carlo, drive past the campsite. The wife similarly stated that she heard tires spin on a gravel road and observed a motor vehicle for about ten seconds. She described the vehicle as a "larger," all-white automobile; she specifically stated that it did not have a dark top on it.

Minnesota Bureau of Criminal Apprehension (BCA) Agent Paul Soppeland, the agent responsible for coordinating the investigation into Nelson's death, arrived at the Park at approximately 6:15 p.m. He and other BCA agents investigated the crime scene. They learned that a little over $2,000 in cash and two gray bank bags were missing from the contact-station safe and that a flat, reddish-colored rock engraved with a buffalo and the words "Blue Mounds State Park" was also missing.

The BCA agents noted several signs indicating that a struggle had taken place inside the contact station. Scattered papers, a hard pack of Doral Light 100's cigarettes, and a broken "field ranger" wristwatch lay on the floor near Nelson's body. One of the pieces of paper was a

flyer advertising six events that were to occur as part of the "2001 Blue Mound Writers Series" at Blue Mounds State Park over the summer months of 2001. The fax machine receiver was knocked off its hook and hung from its cord. A chair armrest was broken, and pieces of plastic from the chair were strewn about. The agents also found pieces of the missing Blue Mounds-engraved rock on the floor next to Nelson's body. Blood was on the floor and ceiling, and on a chair leg, the counter, and the cash tray inside the safe. Nelson's nametag was on the floor near the safe.

A forensic pathologist at the Ramsey County Medical Examiner's Office performed the autopsy on Nelson. The pathologist concluded that Nelson's death was a homicide resulting from multiple traumatic injuries to the head. She determined that the perpetrator struck Nelson on the head a minimum of five times with a "great deal of force," but that the actual number was "probably quite a few more than that." The pathologist also determined that the reddish-colored engraved rock, which investigators eventually recovered from a nearby creek, was likely used to inflict Nelson's head injuries.

### DNA Evidence

A BCA forensic scientist did a DNA analysis of items found at the crime scene. All bloodstains matched Nelson's DNA. But five "DNA mixtures"—profiles that contain the DNA of three or more individuals—were present on the wristwatch. Nelson could not be eliminated as a contributor to some of the DNA mixtures found on the watch, but 300 other known individuals, mostly Nelson's friends and Blue Mounds State Park workers or visitors, were excluded. In 2001, the BCA conducted a fruitless search of the Minnesota Forensic Database and other DNA sample databases for a profile that matched the unknown DNA samples from the watch. Despite further intensive efforts to find the person who killed Nelson, investigators were unsuccessful and the case remained unsolved.

In the fall of 2006, a BCA forensic scientist again analyzed the DNA found on the wristwatch. Because DNA analytical methods and techniques had evolved since 2001, the scientist was able to obtain a "cleaner mixture" than was obtained in 2001. She again searched Minnesota DNA databases in April 2007, and also requested that surrounding states search their databases. The State of South Dakota responded to the inquiry by indicating that appellant, Randy Leeroyal Swaney, could have contributed to the DNA mixture. The BCA then obtained a new DNA sample from Swaney, who at the time was in a South Dakota prison, and confirmed that Swaney could not be eliminated as a contributor to any of the DNA mixtures found on the watch. Further searches determined that Dawn Swaney, Swaney's wife, could have contributed to some of the DNA mixtures on the watch as well.

### Investigation of Swaney

Another BCA forensic scientist compared Swaney's finger and palm print exemplars with unidentified latent finger and palm prints from the crime scene and was able to identify some of the latent prints as Swaney's. This scientist identified two palm prints on the contact station counter as Swaney's, and found Swaney's right palm print, left palm print, and left thumb print on a "2001 Blue Mound Writers Series" flyer recovered from the floor near Nelson's body. None of Dawn Swaney's prints matched any of the prints found at the contact station, and records at her place of employment confirmed her alibi that she had been at work on the afternoon of Nelson's murder.

In mid-April 2007, BCA Investigator Dale Russell travelled to Sioux Falls, South Dakota to interview Dawn Swaney. Dawn Swaney consented to a search of a storage locker and Russell took possession of some family photos and photo negatives found in the locker. Some of the photos showed Swaney wearing a field ranger wristwatch or smoking Doral Light 100's. Other photos depicted Swaney driving a large, cream-colored 1984 Oldsmobile Delta 88 with a brown vinyl top.

The day after Russell interviewed Dawn Swaney, Swaney called her from prison, and the telephone conversation was recorded. During the conversation, Dawn Swaney informed Swaney of her interview with Russell and confronted Swaney about his involvement in Nelson's murder. She also asked about the damage that had been done to their car in May 2001. Swaney denied any involvement in the murder and claimed he had never been to Blue Mounds State Park.

On September 28, 2007, a grand jury indicted Swaney for seven counts of murder. The indictment contained three counts of first-degree murder—including first-degree premeditated murder and first-degree felony murder for intentionally causing Nelson's death while committing or attempting to commit kidnapping—and four counts of second-degree murder.

*Trial*

At trial, the State's witnesses testified regarding the DNA and print evidence that linked Swaney to the crime. A park employee testified that she had placed several copies of the "2001 Blue Mound Writers Series" flyer, including the one found near Nelson's body with Swaney's finger and palm prints on it, on display in the park contact station about four days before the murder.

The State also introduced testimony from two individuals confined in the South Dakota State Penitentiary with Swaney in 2007. The first inmate testified that Swaney made comments that suggested that Swaney was familiar with Blue Mounds State Park, knew his watch was left at the scene of Nelson's murder, and thought law enforcement would be unable to find the two gray bank bags taken from the contact station. The first inmate also testified that Swaney told him that a person was "smoked in the head" during a Minnesota burglary. The second inmate testified that after investigators from Minnesota spoke with Swaney at the State Penitentiary, Swaney complained to him and his cellmate that "they got me this time," and "I'm gonna do life." Additionally, Swaney asked the second inmate about extradition and the death penalty in Minnesota.[1]

Members of Swaney's family testified that Swaney smoked Doral Light 100's hard packs, often wore a wristwatch, and owned a 1984 Oldsmobile Delta 88 in 2001. The State also introduced evidence that Swaney's Oldsmobile was damaged sometime before Memorial Day weekend of that year.

The State also played parts of the recorded telephone conversation between Dawn Swaney and Swaney. In order to "provide context" for the conversation between Swaney and Dawn Swaney, the State first called Agent Russell as a witness. Russell testified that he interviewed Dawn Swaney in mid-April 2007, one day

---

1. The defense admitted evidence to rebut both inmates' testimony. The defense was able to point out inconsistencies with the first inmate's story and that the first inmate was a known "prison rat." Additionally, Swaney called the second inmate's cellmate as a witness and he testified that Swaney never made any incriminating comments to him or to the second inmate.

before the telephone conversation between Dawn Swaney and Swaney took place. Russell testified that he informed Dawn Swaney that Nelson was murdered at Blue Mounds State Park and that a watch and a pack of Doral cigarettes were found at the crime scene. Russell also testified that he explained to Dawn Swaney that the watch contained her DNA as well as Swaney's. Over Swaney's hearsay and Confrontation Clause objections, the district court allowed Russell to repeat to the jury several of the questions he asked Dawn Swaney during the interview. Dawn Swaney did not testify because Swaney asserted his marital communications privilege, preventing her from testifying at trial.

Swaney testified at his trial. He admitted that he took the family Oldsmobile on May 20, 2001, but claimed that he drove to Vermillion, South Dakota, so he could go fishing. Swaney testified that on his way home he damaged the front of the car on a tree stump or pole. Swaney said he went fishing alone so there was no one who could corroborate his story. Swaney attempted to reconcile his statement that he had not been to Blue Mounds State Park with the evidence that his thumb and palm prints were found at the park. He explained that he often went camping and may have visited the Park's contact station to "inquire[ ] about camping and their rates and what they have to offer the children." Swaney also testified that if he did stop to make such inquiries at Blue Mounds State Park he did not do so in May of 2001. But Swaney was unable to explain why his finger and palm prints were found on a "2001 Blue Mound Writers Series" flyer that had been placed on display in the park contact station about

four days before the murder if he had not visited the park during May of 2001.

Swaney also introduced alternative perpetrator evidence regarding Anthony Flowers, an individual who escaped from the Minnehaha County Jail in South Dakota and was at-large from May 1, 2001 until June 1, 2001. Both Stephen Layton, an individual imprisoned at the South Dakota State Penitentiary with Flowers, and Carla Olivarez, an acquaintance of Flowers, testified at Swaney's trial and stated that Flowers confessed to them that he and a female companion killed Nelson. Neither Swaney nor the State called Flowers to testify.

During the State's cross-examination of Layton, the State suggested that Flowers and Layton together decided that Flowers would falsely confess to Nelson's murder so that Flowers could avoid a future transfer to federal prison and instead remain in state prison. The State's theory, as developed during Layton's cross-examination, was that Flowers was worried about returning to federal prison because he believed that in federal prison he was in danger of being assaulted by members of the Aryan Brotherhood because he was Native American. According to the State, Flowers and Layton hoped that if Layton told authorities that Flowers had confessed to killing Nelson, Flowers could avoid being sent to a federal prison. In addition, the two men hoped Layton would get an early release in exchange for providing evidence against Flowers and use any reward money to help Flowers' family. The State introduced evidence that supported this theory. More specifically, the State introduced a piece of paper with indented writing allegedly created by Layton that indicated Layton and Flowers were colluding.[2]

---

2. According to the State's expert, the indented writing represented a letter from Layton to Flowers. Part of the indented writing was

interpreted to state, "Once I go to the pigs they've GOT TO take it seriously! ... [w]ith-

In its cross-examination of Olivarez, the State suggested that Flowers confessed to Olivarez because he knew Olivarez would inform the authorities. The State further attacked Swaney's alternative perpetrator defense by highlighting inconsistencies between the version of events Flowers related to Layton and Olivarez and what actually occurred on the day of Nelson's murder.

Beyond calling Layton and Olivarez as witnesses, Swaney sought to introduce reverse-*Spreigl* evidence regarding a kidnap Flowers committed to facilitate his escape from prison in May 2001. The district court concluded that the reverse-*Spreigl* evidence was inadmissible, and did not allow Swaney to call the kidnapping victim as a witness.

Finally, the district court allowed the State to introduce certain rebuttal evidence. The State called three witnesses, and each testified briefly about the fingerprint analysis process in this case. Part of this rebuttal evidence included testimony from BCA Agent Soppeland that he wore gloves while investigating the crime scene and from a BCA print analyst who stated that Soppeland's finger prints did not match the latent finger prints on park brochures. Another BCA scientist testified that he collected additional finger and palm print exemplars from Swaney in order to assist the finger print analyst in matching the prints found on park brochures. This testimony specifically rebutted Swaney's statement that he could only "assume" the second set of print exemplars were his because he had not signed that set of exemplars.

The jury found Swaney guilty of all seven counts of murder. The district court convicted Swaney of all seven counts and sentenced him to life in prison without the possibility of release. Swaney subsequently filed a direct appeal with our court.

Swaney raises several issues on appeal. He argues that the district erred when it allowed the admission of questions Agent Russell asked during his interview with Dawn Swaney because the questions suggested her out-of-court statements, thereby violating Swaney's right to confrontation. Swaney also claims the court improperly excluded reverse-*Spreigl* evidence regarding Anthony Flowers, thereby violating his right to present a defense and improperly permitting the State to introduce rebuttal evidence. Further, he argues that the State committed prosecutorial error by attacking his character, speculating about events occurring at the time of the killing absent a factual basis in the record, and using evidence of his past convictions as substantive character evidence. Additionally, Swaney makes several pro se claims.

I.

At trial, the State introduced parts of the April 20 recorded telephone conversation between Swaney and his wife Dawn Swaney. The State maintained that the telephone conversation was relevant to the question of guilt because during the conversation, Swaney denied he had ever been to Blue Mounds State Park; claimed that he went fishing on the day of the murder; described what happened to the car on that fishing trip; and acknowledged that his wife was at work on the day of the murder. Before playing the recorded telephone conversation, the State called Agent Russell as a witness to provide context for the conversation. The State offered Russell's testimony to describe to the jury the information Russell gave to Dawn Swaney

out some solid specifics its simply *NOT* gonna work Tony!!"

regarding the murder before her conversation with Swaney.

The district court allowed Russell to testify at trial about his April 19 interview with Dawn Swaney. Russell testified that he drove to Sioux Falls, located Dawn Swaney at a local community college, and questioned her for over an hour at the local police department. The State then asked Russell to repeat some of his out-of-court statements from the interview, specifically the questions he had asked Dawn Swaney. Using a transcript of the interview to refresh his recollection, Russell testified at length about the questions he asked Dawn Swaney. For example, Russell testified that he showed Dawn Swaney a photograph of the watch found at the murder scene and then asked her "if she was familiar with the watch and if she recognized the watch." The State's examination of Russell continued as follows:

State: And then what did you ask her?

Russell: I asked her whose watch it was.

. . .

State: When you showed her the picture of the watch did you ask her anything as far as her use of the watch?

Russell: I did.

State: And did you ask her anything about who might've purchased the watch. . . .

What exactly did you ask regarding the purchase of the watch? If you could give us your exact question.

Russell: Yeah, I—where did he get the watch?

. . . .

State: Did you ask her if she had ever worn the watch that was in the photograph?

Russell: I did.

Russell also testified about questions he asked regarding Dawn Swaney's and Swaney's smoking habits:

Russell: I asked her if she smoked.

State: And then after that what did you ask her?

Russell: I asked her if Randy smoked, and I asked, uh, her if there was a particular brand of cigarette that they usually smoked.

State: Did you ask her anything about her husband's carrying his cigarettes, and if so what did you ask?

Russell: I asked how he would carry his cigarettes and where he would carry them.

Russell then testified that he showed Dawn Swaney a photograph from the crime scene that showed a pack of Doral cigarettes.

Russell: I asked her if that's what he liked, referring to the cigarettes [in the photograph].

. . . .

State: What was the next question you asked Mrs. Swaney after your question, That's what he liked?

Russell: I asked her if she would buy cartons of those types of cigarettes.

Swaney made a standing objection at trial, arguing that several of the questions Russell asked Dawn Swaney implied her answers, were only relevant for that purpose, and were hearsay. Further, Swaney argued that the admission of the questions was a denial of his right of confrontation. For the most part, the district court overruled the objections, stating that though some of Russell's out-of-court statements implied Dawn Swaney's answers, they were Russell's statements and were not hearsay. But the court sustained Swaney's objections when two of Russell's statements directly repeated Dawn Swaney's previous answers.[3] The court said,

3. The court sustained Swaney's hearsay and confrontation right objections after this ex-

"[T]hose cross the line in my—cause they are giving the answer by just the questions he's asking so, I mean, up until then ... they were implied but they weren't direct. These are pretty direct." The court's rulings demonstrate that the court did make an effort to distinguish between questions from which the jury could infer Dawn Swaney's statements and questions that repeated—or, in other words, "direct[ly]" stated—Dawn Swaney's answers and concluded that the former were admissible but the latter were not.

Swaney argues that the admission of Russell's prior statements was essentially the admission of Dawn Swaney's out-of-court statements. Swaney also asserts that the admission of Russell's testimony was a denial of his Confrontation Clause rights because Dawn Swaney did not testify at trial due to the marital communications privilege, Swaney had no prior opportunity to cross-examine Dawn Swaney, and the statements she made to Russell were testimonial. The State points out that only Russell's statements were admitted, not Dawn Swaney's, and argues that the admitted statements were not hearsay because they were offered for the limited purpose of showing what information the BCA gave to Dawn Swaney. The State argues that because the statements were not offered for their truth, there was no Confrontation Clause violation.

Swaney concedes that some of Russell's statements provided the jury with a description of the information given to Dawn Swaney. For example, Russell described Blue Mounds State Park to Dawn Swaney; informed her there was a murder of an employee there in May 2001; told her that a watch and cigarette carton were found at the scene; and explained that her DNA, as well as Swaney's DNA, was found on the watch. But Swaney argues that certain of Russell's question statements, in contrast, "did not contain information that was given to [Dawn Swaney]." According to Swaney, these question statements implied or restated Dawn Swaney's answers and were relevant only if offered for the truth of the matters asserted.[4]

*The Right of Confrontation*

We must determine whether the admission of certain questions Russell asked Dawn Swaney during his interview of her violated Swaney's Confrontation Clause rights. We have said that "whether the admission of evidence violates a criminal defendant's rights under the Confrontation Clause is a question of law this court re-

change between the State and Russell:

> State: And did you ask her about her husband's activities the day of May 20th, 2001?
> ....
> State: And did you have some discussion as it would relate to her employment and who would have access to the car during the time of her employment [on the 20th]?
> ....
> Russell: I asked who, uh, would have had the car, who would have taken the car, uh, and I asked about how the car came back.
> State: And what exactly did you say to her? And I'm referencing the question you

> asked in the middle of page 12 of the interview.
> Russell: Punched in—*so he took you there— then he leaves with the car*—this was the white Delta 88.
> State: And what was your next questions?
> Russell: He left the car with you?
> State: And then what was your next statement to her?
> Russell: *He walked back and it had already been damaged.*
> (Emphasis added.)

**4.** The issue of whether Swaney waived his confrontation rights by invoking the marital privilege was not raised by the parties and therefore is not before us.

views de novo." *State v. Caulfield,* 722 N.W.2d 304, 308 (Minn.2006).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington,* the United States Supreme Court explained that the Confrontation Clause guarantees that testimonial statements made by a witness unavailable to testify at trial are inadmissible unless the defendant had an opportunity to cross-examine the witness. 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also State v. Scacchetti,* 711 N.W.2d 508, 513 (Minn.2006). The Court did not fully articulate what testimonial means, but did explain that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Court further explained that "interrogation" is to be used "in its colloquial, rather than any technical legal, sense," and that a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition" of interrogation. *Id.* at 53 n. 4, 124 S.Ct. 1354. In *Davis v. Washington,* the Court said:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Additionally, the Court explained that the admission of testimonial statements does not implicate the Confrontation Clause if the statements are not offered to prove the truth of the matter asserted. *See Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (citing *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). It said, "The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.*

We first address whether Agent Russell's testimony regarding the questions he asked Dawn Swaney—his out-of-court statements admitted at trial—were offered to prove the truth of the matters asserted. *See id.*; Minn. R. Evid. 801. The State argues that it offered the questions "for the limited purpose of providing context for the subsequent telephone call between Dawn Swaney and [Swaney] and showing 'what information was described to' Dawn Swaney before that telephone call."

During the recorded telephone conversation between Dawn Swaney and Swaney, Dawn Swaney told Swaney that an investigator informed her that a watch with her and Swaney's DNA was found at Blue Mounds State Park, as well as a pack of Doral Light 100's cigarettes. Dawn Swaney asked Swaney several questions regarding his whereabouts on May 20, 2010 and his knowledge of Blue Mounds State Park. When Swaney denied having ever been at the Park, she asked him how a watch with their DNA was found at the park.

We agree with the State that Russell's testimony about showing a photograph of the watch found at the scene to Dawn Swaney, asking Dawn Swaney "if she was familiar with the watch and if she recognized the watch," and telling her that her DNA and Swaney's DNA were found on the watch was relevant for a non-truth

purpose. More specifically, this testimony explains why Dawn Swaney confronted Swaney during their telephone conversation about his use of a watch and was therefore relevant to provide context for the telephone conversation. In addition, Russell's testimony that he showed Dawn Swaney a photograph of the cigarettes found near Nelson's body was properly admitted for a non-truth purpose—to explain why Dawn Swaney knew and told Swaney that the police had found a pack of cigarettes at the crime scene.

Other parts of Russell's testimony, however, were irrelevant to provide context for the telephone call. For example, interview questions about ownership of the watch, her use of the watch, and the purchase of the watch were unnecessary to provide context for the telephone conversation because she did not mention these questions to Swaney during their conversation. She told Swaney that a watch with their DNA was found at a Minnesota campground and asked him how it got there, and was very upset about its discovery, but did not specifically discuss her use of the watch or ask anything about its purchase. Similarly, many of the questions Russell asked Dawn Swaney regarding her and Swaney's smoking habits were irrelevant to provide context for the telephone conversation. Dawn Swaney made only two references to smoking and cigarettes during her telephone conversation with Swaney. She told Swaney, "Oh, they found a pack of cigarettes [at the Blue Mounds State Park] that were Doral Light 100's in a box" and then she said, "And that's what we smoke." Considering the brevity and content of what Dawn Swaney actually said to Swaney regarding the cigarettes, it would have been sufficient to limit Russell's testimony to statements that he showed Dawn Swaney a photograph of the cigarettes found at the crime scene. The questions Russell asked regarding Dawn Swaney's smoking habits, how Swaney carried his cigarettes, and if she bought cartons of cigarettes did not provide the jury with necessary context for the conversation.

Much of Russell's testimony, especially testimony regarding the questions he asked Dawn Swaney, demonstrated that Russell was attempting to and did obtain specific information from Dawn Swaney, rather than to give context to how Dawn Swaney got the information that she used to discuss events with Swaney. We conclude that several of Russell's questions were not relevant to provide context for the subsequent telephone conversation. Because the State has not argued any other non-truth purpose for introducing the questions and no other relevant, non-truth purpose appears to apply, we conclude that the questions were offered to prove the truth of the matter asserted. Therefore, several of Russell's out-of-court questions are hearsay and may implicate the Confrontation Clause. *See* Minn. R. Evid. 801(c); *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

■ Having reached these conclusions, we next address Swaney's argument that the admission of certain questions asked by Russell violated the Confrontation Clause because admission of the questions implied Dawn Swaney's out-of-court testimonial statements. The State did not directly offer Dawn Swaney's statements into evidence. Instead, the State introduced one side of Russell's interview with Dawn Swaney—only the side that included Russell's questions.

The district court recognized that the jury could imply Dawn Swaney's statements from Russell's testimony. But the

court essentially concluded that because Russell only testified as to his own words from the interview, his questions were admissible unless his questions happened to repeat Dawn Swaney's statements during the interview. We disagree. Trial testimony regarding statements or questions that inescapably imply another person's testimonial hearsay statements are not very different substantively from trial testimony that expressly states another person's testimonial hearsay statement. Therefore, we conclude that a district court violates the Confrontation Clause when it admits testimony that inescapably implies a nontestifying witness's testimonial hearsay statement.

Here, many of the interview questions Russell testified about at trial inescapably implied Dawn Swaney's statements regarding the watch and cigarettes. For example, Russell testified that he showed a photograph of the watch found at the scene to Dawn Swaney, and then asked her "if she was familiar with the watch," "whose watch it was," "where did he get the watch?" and did she "ever [wear] the watch that was in the photograph?" The jury could infer from this sequence of questions that Dawn Swaney responded to the first question by stating she was familiar with the watch in the photograph. If she had stated that she was not familiar with the watch, it is very unlikely Russell would have asked her who owned the watch. Similarly, the jury could infer from Russell's third question—"where did he get the watch"—that Dawn Swaney stated in response to his second question that the watch was Swaney's.

Many of Russell's questions regarding Dawn Swaney's and Swaney's smoking habits also inescapably implied Dawn Swaney's statements when answering Russell's questions. Russell testified that he asked Dawn Swaney if she or Swaney smoked cigarettes and then asked her what brand they smoked. Asking Dawn Swaney what brand they smoked implied that she responded yes to previous questions about whether she and Swaney smoked. If she had answered that they did not smoke, there would be no reason for Russell to ask her what brand of cigarettes they smoked, or how Swaney carried his cigarettes. Russell was also allowed to testify that he showed Dawn Swaney a photograph of the cigarettes found on the floor near Nelson's body and asked her if Swaney "liked" the kind of cigarettes in the photograph. He then asked her "if she would buy cartons of those types of cigarettes." Asking Dawn Swaney if Swaney bought cartons of those cigarettes implies that she stated that either she or Swaney liked the kind of cigarettes in the photograph.

In addition, the inescapably implied statements were testimonial. Dawn Swaney's statements were recorded and "knowingly given in response to structured police questioning." *Crawford*, 541 U.S. at 53 n. 4, 124 S.Ct. 1354. Russell, who worked for the BCA, met with Dawn Swaney in order to interview her about Nelson's murder at Blue Mounds State Park. His objective was not to meet an ongoing emergency, but rather to establish "past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266.

For the foregoing reasons, we conclude that Russell's trial testimony regarding several questions he asked Dawn Swaney inescapably implied Dawn Swaney's testimonial statements. Because the questions were offered to prove the truth of the matter asserted, and Swaney did not have an opportunity to cross-examine Dawn Swaney, we hold the admission of the questions was a violation of Swaney's Confrontation Clause rights. *See Crawford*,

541 U.S. at 53–54, 124 S.Ct. 1354; *cf. Favre v. Henderson,* 464 F.2d 359, 364 (5th Cir.1972) (holding there was a violation of the Confrontation Clause because "testimony was admitted which led to the clear and logical inference that out-of-court declarants believed and said that Favre was guilty of the crime charged," and "[t]he informers were not identified and were not subject to cross-examination").

### Harmless Error Analysis

Even though the admission of several of Russell's questions violated Swaney's Confrontation Clause rights, we have held that such an error "does not automatically require reversal of the defendant's conviction and the granting of a new trial." *State v. Courtney,* 696 N.W.2d 73, 79 (Minn.2005). In *Courtney,* we said that Confrontation Clause violations are subject to a harmless error analysis and reversal is not required if the error was harmless beyond a reasonable doubt. *Id.* at 79–80 ("The conviction may stand so long as the erroneous admission of the evidence was harmless beyond a reasonable doubt.").

■ An error is harmless beyond a reasonable doubt "if the guilty verdict actually rendered was 'surely unattributable' to the error." *Id.* at 80. To determine whether the jury's guilty verdict was surely unattributable to an error, we examine the record as a whole and "consider the manner in which the evidence was presented, whether the evidence was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defense." *Id.* Additionally, though evidence of the defendant's guilt is not the sole factor, it is a relevant consideration. *Id.*

■ We conclude that the admission of Russell's questions that implied Dawn Swaney's responses was harmless beyond a reasonable doubt. We do acknowledge that because Dawn Swaney is Swaney's wife, the jury may have given considerable significance to her statements, even if her statements were only implied. Further, some of the evidence was not effectively countered by the defense. But several other considerations support our conclusion that the district court's error was harmless. First, other evidence admitted at trial, including photographs and the testimony of Swaney's family, directly established the facts that the jury could infer from Russell's questions. The State established through the admission of other evidence that Swaney wore a watch like the one found near Nelson's body, smoked Doral Light 100's cigarettes, and drove a white 1984 Oldsmobile Delta 88 on May 20, 2001.[5] Second, the State presented the evidence of Dawn Swaney's statements indirectly—the jury had to infer Dawn Swaney's statements from Russell's testimony. Because it was indirect, the evidence may not have been as persuasive or powerful as it otherwise would have been. Third, the State did not use the evidence in its closing argument.

Finally, the evidence of Swaney's guilt was strong because a watch like the one he wore, with DNA that matched his own, was found at the scene. Swaney suggested in cross-examination that the BCA did not follow proper procedures in testing the DNA on the watch and Flowers's DNA,

---

**5.** The State admitted photographs of Swaney wearing a field ranger watch like the one found near Nelson's body into evidence. Swaney's father and mother-in-law testified that Swaney smoked Doral Light 100's, and photos admitted into evidence showed Swaney smoking or sitting near a pack of Doral cigarettes. Finally, Swaney testified that he owned a 1984 Oldsmobile Delta 88 and that he drove the vehicle on May 20, 2001; the State also admitted photographs of Swaney in the Oldsmobile.

but Swaney was unsuccessful in seriously challenging the DNA evidence. Additionally, Swaney's finger and palm prints were found at the scene. Further, park visitors saw a white car that resembled Swaney's Oldsmobile at the Park on the day of the murder, his alibi could not be corroborated, and the State introduced evidence that Swaney had a gambling problem and a need for money as the motive for the crime.

For all the foregoing reasons, we conclude that the jury's guilty verdict rendered in this case was surely unattributable to the district court's error in admitting Russell's question statements and that therefore, the error was harmless beyond a reasonable doubt. We hold that the violation of Swaney's Confrontation Clause rights in admitting parts of Russell's testimony regarding his interview of Dawn Swaney does not require a new trial.

## II.

Swaney's second claim of error is that the district court erred when it excluded reverse-*Spreigl* evidence regarding Anthony Flowers. Before trial, Swaney planned to present evidence that Flowers was an alternative perpetrator and had confessed to killing Nelson. Swaney also wanted to present reverse-*Spreigl* evidence regarding a past kidnap and robbery committed by Flowers. Swaney intended to call the victim of the kidnap-robbery, a woman named M.K., as a witness to testify about the incident. But the State filed a motion in limine before trial, seeking to exclude Swaney's alternative perpetrator evidence, including reverse-*Spreigl* evidence of the M.K. kidnapping and robbery. The district court ruled that Swaney could present evidence that Anthony Flowers was an alternative perpetrator—allowing Swaney to call Layton and Olivarez to testify that

Flowers confessed to his involvement in the Nelson murder—because the evidence had an inherent tendency to connect Flowers with the commission of the crime that Swaney was charged with. *See State v. Jones,* 678 N.W.2d 1, 16 (Minn.2004). But the court ruled in favor of the State on the reverse-*Spreigl* issue when it concluded that Swaney could not call M.K. as a witness.

■ On appeal, Swaney argues that the district court abused its discretion and violated his constitutional right to present a defense when it granted the State's motion to exclude evidence that Flowers kidnapped and robbed M.K. In *State v. Johnson* we said that "[e]videntiary rulings generally rest within the district court's discretion and will not be reversed absent a clear abuse of that discretion." 568 N.W.2d 426, 432 (Minn.1997). We use the abuse of discretion standard when reviewing a district court's ruling on reverse-*Spreigl* evidence. *See, e.g., Huff v. State,* 698 N.W.2d 430, 435–36 (Minn.2005).

*The Right to Present a Defense and Reverse-*Spreigl *Evidence*

■ We have said, "Due process requires that every [criminal] defendant be afforded a meaningful opportunity to present a complete defense." *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003) (citation omitted) (internal quotation marks omitted); *see* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7; *accord Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). The right to present a complete defense includes the right to present evidence. *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038; *see also United States v. Valenzuela–Bernal,* 458 U.S. 858,

867–68, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (holding that trial courts must allow a defendant to present favorable material evidence). In some cases, courts allow a defendant to use alternative perpetrator evidence, or evidence that inculpates a third person as the perpetrator of the crime charged, in order to cast reasonable doubt on the State's case. *See State v. Hawkins*, 260 N.W.2d 150, 158 (Minn. 1977). Such evidence "is admissible if it has an inherent tendency to connect the alternative party with the commission of the crime." *Jones*, 678 N.W.2d at 16.

A defendant may also seek to present evidence of an alternative perpetrator's other crimes, wrongs, or bad acts. *Id.* The admission of such evidence is in part controlled by Minn. R. Evid. 404(b), which provides that evidence of other crimes, wrongs, or acts separate from the crime charged is not admissible to "prove the character of a person in order to show action in conformity therewith." Under Rule 404(b), however, evidence of a *defendant's* other crimes, wrongs, or acts—sometimes called *Spreigl* evidence—is "admissible for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" if the several requirements in Rule 404(b) are satisfied. Under these requirements, the State must give notice; the State must indicate what the evidence will be offered to prove; the other crime, wrong, or act must be proven by clear and convincing evidence; the evidence must be related to the State's case; and the probative value of the evidence must not be outweighed by its potential for unfair prejudice to the defendant. Minn. R. Evid. 404(b).

 We have said that evidence of an *alternative perpetrator's* other crimes, wrongs, or bad acts—sometimes called reverse—*Spreigl* evidence—is admissible "to cast reasonable doubt upon the identification of the defendant as the person who committed the charged crime." *Jones*, 678 N.W.2d at 16; *see also State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). To introduce reverse-*Spreigl* evidence at trial, a defendant must first meet the threshold requirement of connecting the alternative perpetrator to the commission of the crime with which the defendant is charged. *Jones*, 678 N.W.2d at 16. If the defendant meets this threshold requirement, the reverse-*Spreigl* evidence is admissible if the defendant can show (1) by clear and convincing evidence that the third party participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice. *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000) (citing *Johnson*, 568 N.W.2d at 433–34); *see also Jones*, 678 N.W.2d at 16–17. Though the *Spreigl* and reverse-*Spreigl* tests are similar, we have said that in the case of reverse-*Spreigl* evidence, "Sixth Amendment concerns (right to confront one's accuser and right to present evidence) enter into the picture when it is the defendant who is seeking to present the [other crimes, wrongs, or bad acts] evidence." *State v. Robinson*, 536 N.W.2d 1, 2 (Minn.1995).

Here, the threshold requirement that Swaney connect Flowers to the commission of Nelson's murder is not disputed by the parties and is not at issue. Additionally, the first requirement has been satisfied—because Flowers pleaded guilty to the kidnap and robbery of M.K., there is clear and convincing evidence that Flowers participated in the reverse-*Spreigl* incident.

 The parties, however, do dispute whether the kidnap and robbery of M.K. is

relevant and material to Swaney's case. When offered to establish the identity of the perpetrator, an alternative perpetrator's other crime, wrongs or bad act is relevant to a defendant's case if the other crime, wrong, or bad act is sufficiently similar to the charged crime in terms of time, place, or modus operandi. *State v. Johnson*, 568 N.W.2d 426, 434 (Minn.1997). The reverse-*Spreigl* incident that Swaney sought to introduce at his trial was a kidnap and robbery that Flowers committed in May 2001, a past crime. The central question is whether Flowers's past crime—the kidnap and robbery of M.K.— is sufficiently similar to the Nelson murder in terms of time, place, or modus operandi to be relevant and admissible.

### The Reverse-Spreigl *Incident*

According to police reports, Flowers escaped from the Minnehaha County Jail in Sioux Falls, South Dakota on May 1, 2001. At approximately 10:20 p.m. that evening, M.K. left work and walked to a parking lot. As she unlocked the door to her vehicle, "a man ran at her getting an elbow into the door and stopping her from closing it." M.K. struggled, and Flowers pulled a knife, threatening to kill M.K. if she did not move over. M.K. complied. Flowers tied M.K.'s hands together and tied her hands to his leg with strips of bed sheet. With M.K. in the car, Flowers began to drive M.K.'s vehicle. Flowers asked M.K. if she had any money and took about $60 or $70 from her. Driving away from the parking lot, Flowers told M.K. she did not need to be afraid of him. M.K. responded that she was afraid of Flowers because he had a knife. Flowers later bent the knife and threw it out the car window. Eventually, Flowers drove south on Interstate 29 toward Sioux City, Iowa.

When Flowers and M.K. arrived in Sioux City, Flowers made a call at a gas station pay phone. He then drove around town, observing several different homes. He stopped at one home, tied M.K. to the seat of the vehicle, and walked to the rear of the home. Five minutes later, Flowers returned and warned M.K. not to look in the rearview mirror. As a light blue vehicle pulled up next to M.K.'s vehicle, M.K. glanced over; Flowers became upset and yelled at her. M.K. feared she was "going to be shot or killed." Shortly after this exchange, Flowers stopped, got out of the car, and ordered M.K. to drive one block, take a left, go seven blocks, and then get on the interstate to travel back to Sioux Falls. Eventually, the police apprehended Flowers on June 1, 2001, and Flowers pleaded guilty to the kidnap and robbery.

### The Admissibility of the Reverse-Spreigl *Incident*

■ As stated above, an alternative perpetrator's past crime is relevant to a defendant's case if the past crime is sufficiently similar to the charged crime in terms of time, place, or modus operandi. *Johnson*, 568 N.W.2d at 426, 434. Our case law explains that while an alternative perpetrator's past crime must be sufficiently similar to the charged crime to be admissible, it does not need to be a "signature" crime, or absolutely similar to the charged crime. *Id.*

■ Swaney asserts that the kidnap and robbery committed by Flowers is sufficiently similar to Nelson's murder—the charged offense—to be admitted at trial. The State acknowledges that the kidnap and robbery may be of the same generic type as Nelson's murder but argues that Flowers's past crime is not similar enough in time, place, or modus operandi to Nelson's murder to be admissible. According to the State, the district court properly excluded the evidence and therefore did not abuse its discretion.

We conclude that the district court did not err when it granted the State's motion to exclude the evidence of M.K.'s kidnapping and robbery. Though there were some similarities between the crime committed by Flowers and the charged crime, there were several differences and we cannot conclude that the court abused its discretion in determining that the two crimes were not sufficiently similar.

First, the district court could reasonably conclude that the modus operandi of the two crimes were not sufficiently similar. Swaney points out that he was charged with and found guilty of first-degree felony murder for intentionally causing Nelson's death while committing or attempting to commit kidnapping and argues that both crimes included a kidnapping and robbery of a lone woman. Additionally, the perpetrator of each crime used a weapon to facilitate the crime, and either threatened to kill or ultimately killed his victim. But the kidnappings that occurred were dissimilar. Flowers kidnapped M.K. and forced her to travel with him from Sioux Falls, South Dakota to Sioux City, Iowa. The purpose of the kidnapping appears to be the facilitation of Flowers's escape from the Minnehaha County Jail. In the Nelson murder, the State surmised that the perpetrator forced Nelson to move within the contact station: from the bathroom area, to the rear of the employee-only area to open the safe, and back to the area immediately behind the counter where Nelson's body was ultimately found. The purpose of the kidnapping of Nelson appears to be the facilitation of robbing the Park.

The perpetrator of each crime used a weapon during the crime, but it appears that neither perpetrator came prepared to use a weapon. Each used a weapon that was found during the commission of the crime—Flowers a knife in a stairwell, the perpetrator of the Nelson murder an engraved rock in the contact station. But the perpetrator of the Nelson murder used the rock to brutally assault and kill Nelson, while Flowers used the knife to threaten M.K. and then threw the knife out the car window. The weapons were not the same, and in one instance, the perpetrator did not use the weapon to physically injure the victim and eventually threw the weapon away while the criminal act continued to take place.

As to time and location, the district court again was reasonable in concluding that the two crimes were not sufficiently similar. Flowers kidnapped and robbed M.K. on May 1, 2001. The Nelson murder occurred 19 days later on May 20, 2001. Sioux Falls, South Dakota-the location where Flowers kidnapped M.K.—is approximately 36 miles from Blue Mounds State Park. Sioux City, Iowa—the location where Flowers transported and eventually released M.K.—is approximately 91 miles from Blue Mounds State Park. Though the crimes were not entirely dissimilar in terms of time and geographic location, we conclude that they were not similar enough for us to hold that the court abused its discretion when it excluded this evidence.

We acknowledge that because Swaney sought to introduce the other crimes evidence, Sixth Amendment concerns regarding the right to present evidence are at issue in this case. Yet we cannot conclude that the district court abused its discretion in excluding the reverse-*Spreigl* evidence because the court reasonably determined that the kidnap and robbery committed by Flowers was not sufficiently similar in time, place, or modus operandi to Nelson's murder. We therefore hold that the court did not err in granting the State's motion to exclude evidence of Flowers's kidnap and robbery of M.K.

### III.

Swaney's third claim of error is that the State committed prosecutorial error by improperly attacking Swaney's character, speculating about events occurring at the time of the murder absent a factual basis, and improperly using past-crimes impeachment evidence as substantive character evidence.

*Improper Character Evidence*

■ At trial, the State briefly questioned Swaney's mother-in-law, father, and mother as well as Swaney about Swaney's child with Dawn Swaney, and K.B. and C.S.—his two children from previous relationships. Through these questions, the State established that Swaney's parents were raising C.S. and that K.B. lived in Minnesota with her mother, Swaney's ex-girlfriend.

More specifically, the State first asked Swaney's mother-in-law if Swaney had any other children and asked where the children were living. When the State asked Swaney's mother-in-law who was raising C.S., Swaney objected to the question on the grounds of relevance and the district court sustained that objection. The court also sustained a relevance objection when the State later asked Swaney's mother-in-law whether Swaney saw C.S. often.

The State then called Swaney's father to testify and asked him three questions about C.S. Swaney's father testified as to C.S.'s age and stated he had been C.S.'s guardian for twelve years. The State then called Swaney's mother, who testified only that C.S. lived with her and that she did not know how old K.B. was. Finally, the State asked Swaney if he had any contact with K.B.

Swaney now argues that the State circumvented a district court ruling and intentionally elicited inadmissible character evidence when it asked witnesses about his children. Swaney claims that the questions suggested he was a bad father. The State argues that the questioning was relevant to the credibility of the witnesses because it "shed light upon [Swaney's] relationship with his mother-in-law" and showed "the possible interest, bias, and prejudice of [Swaney's] mother and father," who were raising C.S.

First, we conclude that Swaney's assertion that the State circumvented a district court ruling lacks support in the record. The court sustained defense-made relevance objections to two questions posed to Swaney's mother-in-law regarding Swaney's daughter C.S. After the second objection was sustained, the State moved onto another line of questioning. The State later asked Swaney's mother and father and Swaney himself a limited number of questions regarding Swaney's children, but we cannot characterize this questioning as an attempt to circumvent the rulings of the court as the court never directed or ordered the State to refrain from asking additional questions about Swaney's children.

Second, we conclude that the State's questioning was not an impermissible attempt to elicit inadmissible character evidence intentionally. We have said that it is error for the State to elicit inadmissible character evidence and that "[q]uestions by a prosecutor calculated to elicit or insinuate inadmissible and highly prejudicial character evidence and which are asked in the face of a clear trial court prohibition are not tolerable." *State v. Harris*, 521 N.W.2d 348, 354 (Minn.1994). But here, the information sought by the State was more akin to basic background information about Swaney and the witnesses than inappropriate character evidence. Further, at least some of the information elicited by the State was necessary. We agree with the State that the questions allowed by the

district court were relevant to describe Swaney's relationship with his relatives. Finally, the questions posed to Swaney about his ex-girlfriend and their daughter K.B. were relevant to Swaney's presence in Minnesota, as K.B. and her mother lived in Minnesota.

*Speculation About Events at the Time of the Murder*

Swaney argues that during closing argument the State improperly speculated about the events that occurred at the time of Nelson's murder. We said in *State v. Bradford* that "[a]rguments of counsel must not speculate about events occurring at the time of the killing absent a factual basis in the record." 618 N.W.2d 782, 799 (Minn.2000). But we have also said that the State "need not make [its] argument entirely colorless and may state conclusions and inferences which the human mind may reasonably draw from the facts in evidence." *State v. Gulbrandsen*, 238 Minn. 508, 511, 57 N.W.2d 419, 422 (1953); *see also State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980) ("Counsel have the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom.").

■■■ Swaney argues that the State violated the *Bradford* rule that counsel may not speculate or make arguments absent a factual basis in the record when it claimed that Nelson was in the restroom when Swaney entered the contact station and when it suggested that Swaney may have stolen a wristwatch. *See* 618 N.W.2d at 799. The State asserts that it properly based the assertions it made during its closing argument on evidence admitted at trial.

During closing argument, the State stated that when Swaney entered the contact station on the day of the murder, he was able to catch Nelson off guard because she was in the restroom. Evidence at trial, including the condition of Nelson's body, supported an inference that Nelson may have been in the restroom when Swaney entered the contact station. We conclude that because the assertion was an "inference[ ] which the human mind may reasonably draw from the facts in evidence," it was a permissible inference rather than improper speculation. *Gulbrandsen*, 238 Minn. at 511, 57 N.W.2d at 422.

During closing argument, the State also attempted to address the fact that the pictures it introduced into evidence showed Swaney wearing a field ranger wristwatch both before and after the date of Nelson's murder. The State suggested that Swaney wore his field ranger watch on the day of the murder, lost it while struggling with Nelson in the contact station, and then obtained an identical watch as a replacement. During closing argument, the State also reiterated testimony from trial that established retailers had field ranger watches in stock and for sale both before and after Nelson's murder. The State then acknowledged that it was unable to find any record that Swaney had purchased a replacement watch from one of these retailers and stated, "[c]ertainly one could question from the evidence you've heard in this case whether the defendant when he got that replacement watch even paid for it. Maybe he decided to steal the watch so there'd be no record of that purchase."

We conclude that the assertion that Swaney might have stolen a replacement watch was a permissible inference made by the State because the inference could be "reasonably draw[n] from the facts in evidence." *Gulbrandsen*, 238 Minn. at 511, 57 N.W.2d at 422. The State established at trial that Swaney wore a field ranger watch before May 20, 2001, a broken watch

with DNA that matched Swaney's DNA was found near Nelson's body, Swaney wore an identical watch after the murder, and the State was unable to find a record of Swaney's purchase of a replacement watch. From these facts, one could reasonably draw the inference that Swaney "[m]aybe ... decided to steal the watch so there'd be no record of that purchase."

*Improper Use of Impeachment Evidence*

Swaney argues that the State committed prosecutorial error by using past-crimes evidence to suggest that he stole a replacement watch. At trial, the State impeached his testimony with his past convictions, many of which were theft crimes. Swaney claims that the State's mention of "the evidence you heard in this case" was a reference to Swaney's past theft convictions and impermissibly suggested that Swaney stole a replacement watch because he had a propensity to steal. According to Swaney, because a party may use past-crimes evidence only to impeach a witness's character for truthfulness, the State's use of Swaney's past crimes as propensity evidence was prosecutorial error. In response, the State argues that the phrase "the evidence you've heard in this case" likely referred to evidence that Swaney wore a field ranger watch both before and after the murder even though his watch was found at the contact station.

■ According to the Minnesota Rules of Evidence, past-crimes evidence is only relevant to attack a witness's credibility or character for truthfulness and may be used only to impeach a witness. Minn. R. Evid. 609(a). A party may not use past-crimes evidence to prove a witness has a propensity to steal.

■ After examining the State's statements during closing argument, we conclude that the State did not commit prosecutorial error by using evidence of Swaney's past theft convictions to show he has a propensity to steal. Here, the State did not directly refer to Swaney's past convictions in its closing to support the inference that he stole a replacement watch, or ever indirectly hint that Swaney's past theft convictions should lead the jury to conclude Swaney stole a replacement watch. The State was attempting to explain why Swaney was wearing a field ranger watch after the murder even though it had alleged that Swaney lost his watch while assaulting Nelson and could not prove that Swaney purchased a replacement. The connection between the statement "the evidence you've heard in this case" and evidence of Swaney's past convictions is too tenuous for us to conclude that the State committed prosecutorial error.

To summarize, we conclude that the record does not support Swaney's assertions that the State (1) attacked Swaney's character with improper character evidence, (2) inappropriately speculated about events at the time of the murder, and (3) used impeachment evidence improperly to suggest that Swaney had a propensity to steal. We therefore hold that the State did not commit prosecutorial error.

## IV.

■ Swaney's fourth claim of error is that the district court erred when it allowed the State to present rebuttal testimony over Swaney's objection. In *State v. Eling*, we explained that a "determination of what constitutes proper rebuttal evidence rests almost wholly in the discretion of the trial court." 355 N.W.2d 286, 291 (Minn.1984). We review a district court's decision to admit rebuttal evidence for abuse of discretion. *State v. Gutierrez*, 667 N.W.2d 426, 435 (Minn.2003) ("The determination of whether or not something is appropriate rebuttal evidence rests with-

in the discretion of the trial court and will only be reversed upon a showing of a clear abuse of discretion.").

Minnesota Rule of Criminal Procedure 26.03, subd. 11(g) (2009), stated the general rule regarding rebuttal testimony. This Rule provided that "[t]he prosecution may offer evidence in rebuttal of the defense evidence." Minn. R.Crim. P. 26.03, subd. 11(g). We have explained that "[i]n general, rebuttal evidence consists of that which explains, contradicts, or refutes the defendant's evidence." *State v. Swanson*, 498 N.W.2d 435, 440 (Minn.1993); *accord State v. Walker*, 306 Minn. 105, 112, 235 N.W.2d 810, 815 (1975).

▇▇▇ In its case-in-chief, the State presented evidence that a BCA forensic specialist was able to match Swaney's print exemplars to prints found at the park contact station. During Swaney's case-in-chief, the State cross-examined Swaney, asking him about the print exemplars used to make the print identification.

> State: [referring to exhibit 194, print exemplars] And is your signature on each of those six pieces of paper?
>
> Swaney: From April 20? Yes, it is.
>
> State: And are these in fact prints of your—inked impressions of your fingers?
>
> Swaney: Um, I would assume so.
>
> . . .
>
> State: [referring to exhibit 195, print exemplars] Are these your finger and palmprint impressions on these four pieces of plastic? You can look at them if you want.
>
> Swaney: I can only assume because I don't see my signature on there anywhere.

Swaney also maintained that he did not visit the contact station around the time of the murder, and he implied that the finger-prints identified as Swaney's could have been Agent Soppeland's fingerprints.

The district court then allowed the State to call three rebuttal witnesses to address the possibility created by Swaney's testimony that "the prints that were identified were not Swaney's prints but were in fact Soppeland's prints because he was in the building." One rebuttal witness, a forensic specialist with the Sioux Falls police department, testified that he obtained the first set of exemplars from Swaney, which both he and Swaney signed, which provided foundation for the introduction of the first set of exemplars. Another rebuttal witness was the BCA forensic specialist who analyzed and matched Swaney's finger and palm print exemplars with finger and palm prints found at the crime scene. This witness explained that he ultimately used two sets of Swaney's print exemplars to identify prints from the crime scene as Swaney's prints because during his initial analysis, he noticed that parts of Swaney's left thumb print and palm print were not captured completely in the first signed set of exemplars. As a result, Soppeland obtained another set of exemplars from Swaney but failed to have Swaney sign the exemplars. Soppeland also testified as the State's third rebuttal witness and confirmed that he obtained the second set of print exemplars from Swaney. The testimony of the BCA forensic expert and Soppeland provided the foundation necessarily for the second set of print exemplars introduced during rebuttal. Further, the BCA forensic specialist testified that Soppeland's prints did not match the latent prints found at the contact station, and Soppeland testified that he wore gloves during the investigation at the contact station. The rebuttal lasted approximately eleven minutes.

Swaney argues that permitting the State to call the three rebuttal witnesses was

error because Swaney's case-in-chief and the State's justification for the rebuttal were "patently insufficient to warrant rebuttal." Swaney argues that because he did not present any expert evidence in his case-in-chief, the State's rebuttal acted to confirm the State's case-in-chief rather than contradict or refute Swaney's case. The State argues that the rebuttal evidence was necessary to address a clear challenge to the State's fingerprint evidence.

We conclude that the State's rebuttal testimony properly refuted Swaney's evidence. The State designed a concise rebuttal to address the suggestion made during Swaney's testimony that the print exemplars that matched previously unidentified prints at the contact station may not have been Swaney's exemplars. Because the State's rebuttal was relevant, concise, to the point, and specifically offered to refute Swaney's testimony that he could only "assume" the second set of print exemplars were his, we hold that the district court did not abuse its discretion in allowing the State to present the rebuttal testimony.

## V.

Finally, Swaney makes twelve other arguments in his pro se supplemental brief. He argues that (1) the district court should have granted his change of venue request; (2) he did not receive a fair trial because the jury was biased against him; (3) the State improperly used personal letters in its case-in-chief even though they were only to be used for impeachment purposes; (4) the court should not have allowed the State to play a tape of his telephone conversation with Dawn Swaney to the jury; (5) the State improperly used parts of a presentence investigation report to suggest Swaney had a gambling problem; (6) the State improperly acknowledged Nel-

son's father in the courtroom in the presence of the jury; (7) the State improperly coached a witness; (8) the State improperly instructed the jury on premeditation; (9) the State called a witness who was not on its witness list; (10) the State misrepresented a camp visitor's testimony; (11) the State called a witness for the purpose of "character assassination"; and (12) the State knowingly allowed two witnesses to "perjure themselves" while testifying. We have examined each claim presented in Swaney's pro se brief and conclude that each claim lacks merit. We therefore hold that there was no error.

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring).

I concur in the result, but I write separately to note my disagreement with the court's conclusion that there was no prosecutorial misconduct. The court concludes that the State did not commit misconduct when it questioned witnesses about Swaney's children and when it suggested to the jury during closing argument that Swaney stole a replacement watch based on "the evidence you've heard in this case." I would hold that the State did commit misconduct, but concur in the result because the misconduct was harmless and did not affect Swaney's substantial rights.